Demichael R. JACKSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–09–00223–CR.

Court of Appeals of Texas, Houston (1st Dist.).

April 15, 2010.

Austin R. Jackson, Tyler, TX, for Appellant.

Carolyn Mills, Assistant Criminal District Attorney, Tyler, TX, for Appellee.

Panel consists of Justices JENNINGS, HANKS, and BLAND.

## OPINION

GEORGE C. HANKS, JR., Justice.

A jury found appellant, Demichael R. Jackson, guilty of engaging in organized criminal activity relating to the underlying offense of aggravated robbery with a deadly weapon. *See* TEX. PENAL CODE ANN. § 29.03 (Vernon 2003) (Aggravated Robbery), § 71.02 (Vernon Supp. 2009) (Organized Criminal Activity).[2] The jury assessed punishment at 60 years' impris-

onment and a $10,000 fine. On appeal, appellant argues that (1) the trial court erred in admitting evidence of criminal activities that did not involve appellant during the guilt or innocence phase and (2) appellant's trial counsel's failure to object to the State's improper closing argument amounted to ineffective assistance of counsel. Because we sustain appellant's first issue, we need not reach his second issue. We reverse and remand.

## Background

On May 29, 2008 around 2:00 a.m., Nicholas Graham and four friends were playing video games at Graham's house when they heard a knock at the front door. Graham did not recognize the person and did not open the door. Approximately five minutes after the knock, three men kicked down Graham's front door and entered the house. Graham identified appellant as the first man to enter the house, while brandishing a gun. The gunman told Graham and his friends to be quiet and that they were being robbed. One of Graham's friends told the gunman that "[they] didn't want any trouble," and the gunman responded by punching that friend in the face. The gunman ordered Graham and his friends to empty their pockets and then, directed the other two men to collect the belongings and find something to put them in. Graham testified that he followed all of the orders because appellant had a gun and he feared for his life. Graham testified that appellant said he "was going to murder [him]," asked "if murder

2. Section 71.02 was amended by the 81st Texas Legislature in 2009, adding subsection (a)(14) and making nonsubstantive changes. Because the amendment does not affect this case, we cite to the current statute.

was a sin," and told Graham "he would kill [him] in coldblood and not worry about it and leave [his] house without a problem." Appellant told Graham that he and his friends had been watching Graham and his roommates and told them "if [they] thought that the only white people in his neighborhood weren't going to get robbed, then [they] were crazy."

Graham and his friends testified that the intruders wore disguises to cover their faces. Despite appellant's attempt to disguise himself, Graham testified that he was able to positively identify appellant because "he forgot to hold up his bandanna" when he was screaming and holding a gun in Graham's face. Graham testified that most of the time appellant was in the house the bandanna was not on his face.

Graham testified that appellant packed the stolen items into backpacks and bags he found in Graham's bedroom. While packing the bags, the gunman fired his gun in close proximity to Graham and his friends, but Graham testified he believed it was an accident. After the gun fired, the gunman took Graham and his friends to the bathroom and told them that if he heard them move, he would come back and shoot them. The intruders stole a plasma screen television, cell phones, wallets, a video game system, video games, a DVD player, a desktop computer, a watch, and cash.

One of Graham's friends, Christopher Bunce, had left Graham's house to take a phone call. As he was returning to Graham's house, he saw a man he identified as appellant and the two other men walking towards a car. Appellant yelled at Bunce to get his attention and fired a gun into the air and in Bunce's direction from about 15 to 20 feet away.

One of the other men involved in the robbery, Jaszman Mitchell, testified at trial. Mitchell testified that appellant was a leader of the Westside Crips Rolling Sixties, a criminal street gang. Mitchell began associating with the gang in 2006 but denied being a member of the gang. Mitchell testified that he was a Blood. Mitchell testified that appellant and the rest of the Westside Crips Rolling Sixties were involved in "a lot of fighting, jumping, and really just breaking into cars and things like that." Mitchell testified that, on the day of the offense, he "met up" with appellant, Jerry Amie, and Jerrell Amie to commit the robbery, which he said was appellant's idea.

Mitchell gave his account of the robbery. Mitchell testified that the men drove in Jerry Amie's car and parked a few houses down. Jerrell Amie knocked on the front door to see who was home and reported back to the men. Then, appellant, Jerry Amie, and Mitchell returned to Graham's house to commit the robbery, leaving Jerrell with the car. Mitchell testified that they were armed: Mitchell had a crowbar, Jerry Amie had a knife, and appellant had a gun. Mitchell testified that appellant kicked in the door and threatened Graham and his friends to surrender their purses, wallets, and phones "before we have to do something." As the men were leaving the house and walking toward the car, appellant noticed a young man up the street talking on a phone. Appellant ran in the man's direction and "let shots loose" firing twice or three times. Appellant and the other assailants went to Jerry's house and discussed their plan for pawning the stolen goods.

At trial, the State offered the testimony of Tyler Police Department Detective Chris Miller. Miller testified that appellant was a leader of the Westside Crips Rolling Sixties criminal street gang. Miller also described an aggravated assault he investigated in 2007, although it was undisputed that appellant was not a party to

that offense. That aggravated assault occurred after a highschool football game at Rose Stadium. While trying to leave the parking lot, Christopher Ervin asked some individuals to get out of the way of his car. One of these individuals, Roderick Houston, punched Ervin in the face and approximately thirty other individuals began to beat on him. Ervin's daughter tried to protect her father, but she too was assaulted. Miller testified that, as a result of the assault, Christopher Ervin can no longer smell or taste. Miller determined that gang members of the Westside Crips Rolling Sixties and the Northside Crips were involved in the assault. Over appellant's objection, the State offered poster-sized photos from the incident detailing the crime scene and the injuries sustained by Ervin and his daughter. Also over appellant's objection, the State introduced a small semi-automatic pistol seized from appellant's home during the execution of a search warrant on May 10, 2007, a year prior to the charged offense.

Additionally, the State offered the testimony of Linda Schaffer and Paul Montgomery regarding a purse-snatching that occurred on May 24, 2008, although it was undisputed that appellant was not a party to the offense. While walking back to her car after purchasing movie tickets, a man hit Schaffer from behind and then ran off with her wallet. Schaffer then noticed two men sitting in a big blue car who had observed the events. When Schaffer asked the men if they knew the purse thief, they drove off. At trial, Jaszman Mitchell admitted he, Ladarius Scott and Jerry Amie were involved in the purse snatching.

## Analysis

### A. Admissibility of Evidence

In his first issue, appellant contends that the trial court erred in admitting evidence regarding two offenses to which appellant was undisputedly not a party and a handgun discovered at his home a year prior to the charged offense. Specifically, appellant asserts that the evidence was not relevant under Rules 401 and 402 or, in the alternative, that any probative value was substantially outweighed by the danger of unfair prejudice under Rule 403. *See* Tex.R. Evid. 401, 402, 403.

### 1. Preservation of Error

The State argues that appellant failed to properly preserve portions of the argument. Accordingly, we will address this point first.

 To preserve an issue for appellate review, the trial record must reflect that appellant made a timely objection stating the specific legal basis and obtained a ruling on that objection. Tex. R.App. P. 33.1(a)(1)(A); Tex.R. Evid. 103(a)(1); *Layton v. State*, 280 S.W.3d 235, 238–39 (Tex.Crim.App.2009). Subject to two exceptions, a party must continue to object each time inadmissible evidence is offered. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex.Crim.App.2003). The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury. *Id.* Under the second exception, when a court, out of the jury's presence, hears and overrules objections to evidence, those objections need not again be made before the jury when the evidence actually is presented to the jury. Tex.R. Evid. 103(a)(1); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim.App.1991).

Here, appellant made a pretrial objection to evidence in a motion titled "Motion in Limine." The court granted the motion in limine "for the purposes of voir dire" and the court said it would address the issues prior to the start of evidence. Before the start of trial on the merits, the

prosecutor brought the issues to the court's attention. The prosecutor stated that he intended to offer evidence of two offenses committed by members of the Westside Crips Rolling Sixties gang during the guilt or innocence phase. While it was undisputed that appellant was not involved in either offense, the prosecutor argued that the evidence was admissible to show that appellant was a member of a criminal street gang that continuously and regularly engaged in criminal activities. Additionally, the prosecutor stated his intention to introduce evidence during the guilt or innocence phase that was seized from appellant's home during a search a year before the commission of the charged offense. That evidence included pictures and writings linking appellant to the gang, as well as a handgun.

Appellant's trial counsel objected that the two offenses were inadmissible extraneous offenses or alternatively, should be excluded under Rule 403, because appellant was not involved in either offense. Appellant's counsel argued that evidence of offenses that the gang committed without the involvement of appellant should be excluded under Rule 403 because any probative value the evidence had to show that appellant was a member of the gang was substantially outweighed by the danger of unfair prejudice. Counsel pointed out that the State had photos of appellant "with the gang signs," so the State was not in need of evidence to prove appellant's membership in the gang. Additionally, counsel pointed out that the case law relied on by the State allowed for admission of gang evidence during the punishment phase of trial, rather than guilt phase, and in each case the defendant was involved in the prior offenses committed by the gang.

During this pretrial hearing, both the State and appellant requested a definitive ruling on the admissibility of the evidence

and the record shows that the court understood it as such. The trial court overruled "all [appellant's trial counsel's] objections," ruling that "the Court [would] allow the proffered testimony ... because the State [was] required to prove ... in the guilt or innocence phase of the trial that the defendant committed the offense as a member of a criminal street gang."

Thus, the court, outside of the jury's presence, heard and overruled appellant's objections to evidence, and therefore, appellant was not required to continue to object when the evidence was actually presented to the jury. *See* Tex.R. Evid. 103(a)(1); *Ethington,* 819 S.W.2d at 858. Consequently, appellant's objections were sufficient to preserve his complaint about the admissibility of evidence regarding the two offenses under Rule 403. However, because appellant did not object pretrial on the grounds of Rules 401 and 402, we agree that appellant has waived his argument that the evidence is inadmissable under Rules 401 and 402.

### 2. Standard of Review

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard. *Casey v. State,* 215 S.W.3d 870, 879 (Tex.Crim.App.2007). "A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement." *Id.* The trial judge should not be reversed simply because an appellate court believes that it would have decided the matter otherwise. *Powell v. State,* 189 S.W.3d 285, 288 (Tex.Crim.App. 2006).

### 3. Elements of Engaging In Organized Criminal Activity

To establish engaging in organized criminal activity, the State had the burden to prove beyond a reasonable doubt that appellant committed the underlying offense of aggregated robbery or robbery with the

intent to establish, maintain, or participate as a member of a criminal street gang. *Curiel v. State,* 243 S.W.3d 10, 16 (Tex. App.-Houston [1st Dist.] 2007, pet. ref'd); *see* TEX. PENAL CODE ANN. § 71.02. Section 71.01 of the Penal Code defines "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." TEX. PENAL CODE ANN. § 71.01(d).

### 4. Balancing Test under 403

 Under certain circumstances, even relevant evidence can be excluded. TEX.R. EVID. 403. Evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. *Id.* A proper Rule 403 analysis requires the trial court to balance the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted.

*Casey,* 215 S.W.3d at 880 (citing *Gigliobianco v. State,* 210 S.W.3d 637, 641–42 (Tex.Crim.App.2006)). The court determines the probative value of evidence by determining how strongly the evidence "serves to make more or less probable the existence of a fact of consequence to the litigation" coupled with the proponent's need for that item of evidence. *Id.* at 879. Then, the trial court must assess whether the probative value is substantially outweighed by one of the countervailing considerations listed in Rule 403. *Id.*

The trial court has a considerable amount of freedom in evaluating the probative value of evidence in relation to its prejudicial effect. *Montgomery v. State,* 810 S.W.2d 372, 378 (Tex.Crim.App.1991) (op. on reh'g). The court, in close cases, should favor admission in keeping with the presumption of admissibility of relevant evidence. *Hernandez v. State,* 817 S.W.2d 744, 746 (Tex.App.-Houston [1st Dist.] 1991, no pet.).

### 5. Analysis

This issue involves the admission of (1) testimonial evidence regarding the two offenses to which appellant was undisputedly not a party, (2) photographs from one of the offenses, and (3) a handgun recovered from a search of appellant's home a year prior to the charged offense. We will address each type of evidence separately.

*Testimony Regarding Two Offenses*

First, appellant argues that the trial court erred in allowing testimony regarding two specific offenses (the assault at Rose Stadium and the robbery of Linda Schaffer) committed by members of the Westside Crips Rolling Sixties during the guilt or innocence phase of the trial. Appellant was alleged to be a member of the gang, but it was undisputed appellant was not involved in either offense.

*Robbery of Linda Schaffer*

During the State's case-in-chief, the State offered the testimony of Linda Schaffer, the victim of a May 26, 2008 robbery. Schaffer testified that at around 2 p.m., as she was walking to her car in a movie theater parking lot, a man hit her

from behind, took her wallet, and then ran to the neighboring apartment complex. Schaffer started running after the man but stopped when she noticed two men in a big blue car who yelled towards her asking about what had happened. Schaffer told them that her purse had been stolen. Schaffer had a strange feeling that the men in the blue car were involved, and she asked them if they knew the man who stole her purse. One of the men got out of the car, denied knowing the man, and then got back into the car and "took off." Schaffer identified a picture of the blue car, which was taken from a camera at a gas station where her credit card had been used.

Schaffer testified that because of the incident, she became "much more cautious." Schaffer was able to identify the person who stole her purse. Schaffer testified that appellant was not the individual who took her wallet and she did not believe he was one of the individuals in the car.

Additionally, the State offered the testimony of Paul Montgomery, who witnessed the robbery of Schaffer. Montgomery testified that "in broad daylight" a man approached Schaffer from behind and grabbed her purse. Montgomery chased after the man towards the fence of an apartment complex and by that time, was out of breath. Montgomery saw a group of three young men on the other side of the fence, looking at him with "an aggressive stance, and they were waiting for me" as if they "knew he would be coming." Realizing he was outnumbered, he discontinued his pursuit of the man. Montgomery testified that Schaffer did not do anything to deserve being the victim of a theft. On cross-examination, Montgomery testified that he did not recognize appellant as one of the men involved in the purse snatching.

Jaszman Mitchell, a co-defendant in the charged offense, also provided testimony regarding the purse-snatching. Mitchell testified that he, Jerry Amie, and Ladarius Scott spent the day taking tools from people's garages in South Tyler and then went to the movie theater parking lot "to snatch a purse and go through the cars." Mitchell indicated that Scott grabbed the purse from Schaffer, while he and Amie were in Amie's car. Then, the men used Schaffer's credit cards at gas stations. Appellant was not with them at either time. On cross-examination, Mitchell testified that appellant was not involved in the use of Schaffer's credit card, the purse-snatching or the planning of that offense in any way.

Detective Miller also testified that there was no information or probable cause to indicate that appellant was involved in the purse-snatching.

*The Rose Stadium Assault*

Also during the State's case-in-chief, Detective Miller was asked to discuss "some of the acts that ... Westside Crips gangs and gang members have been involved in." Miller testified regarding the details of a 2007 aggravated assault in the Rose Stadium parking lot. Miller testified that Christopher Ervin and his daughter were in their vehicle attempting to leave the parking lot. A group of individuals were in the street blocking the exit, and when Ervin got out of the car to ask the individuals to move, he was punched in the face and knocked unconscious by Roderick Houston. Then, approximately 30 people began to beat Ervin. Ervin's daughter was also assaulted when she got out of the car to protect her father and sustained a broken arm. Miller testified that as a result of the aggravated assault, Mr. Ervin can no longer smell or taste.

Miller testified that the large group of individuals that committed the assault included members of the Westside Crips

Rolling Sixties gang and the Northside Crips gang. However, Miller testified that there was no probable cause to believe that appellant was involved in the assault.

*Rule 403 Balancing Test*

*i) Probative Value and Need for Evidence*

■■■■ "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Casey,* 215 S.W.3d at 879 (citing *Gigliobianco,* 210 S.W.3d at 641). In evaluating the inherent probativeness and strength of extraneous offense evidence, we consider "the similarity of the extraneous transaction to the charged offense." *Montgomery v. State,* 810 S.W.2d 372, 390 (Tex.Crim.App.1990). "It is also a function of the strength of the proponent's evidence to show the opponent in fact committed the extraneous conduct." *Id.*

The State argues that "in order to establish the alleged offense, the State was required to show that Appellant and his fellow gang members 'continuously or regularly associate in the commission of criminal activities,' [and, accordingly,] some evidence of the gang's prior offenses, including the assault at Rose Stadium [and] the robbery of Linda Schaffer ... was relevant." Appellant concedes that, because he was indicted under Section 71.02 of the Penal Code for organized crime "as a member of a criminal street gang," some evidence of gang involvement would be relevant and probative to that element of the State's case.

As a preliminary matter, we note that the State misstates the law regarding the elements of the offense. The State was required to prove that (1) appellant committed the underlying offense of aggregated robbery or robbery and that (2) appellant did so with the *intent to establish, maintain, or participate* as a member of a criminal street gang.[3] *Curiel,* 243 S.W.3d at 16. The core component of the second element is appellant's intent to act as part of a criminal street gang. "Criminal street gang" is defined as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." Tex. Penal Code Ann. § 71.01(d). Evidence showing that members of the gang participated in other criminal activities is relevant, as it helps establish the existence of a "criminal street gang." However, where appellant was not involved in the other offenses, evidence of those specific instances without showing knowledge on the part of appellant is of little or no probative value to show appellant's intent or mental state to act as part of a criminal street gang. The existence of a "criminal street gang" is ancillary to the actual element that the State was required to establish.

Courts have addressed the admissibility of gang evidence in the guilt or innocence phase of a prosecution for organized criminal activity under Section 71.02, finding that the Rule 403 balancing test warranted admission in two situations. First, *specific* evidence regarding prior offenses has been found to be admissible, after conducting a Rule 403 analysis, where the evidence shows the defendant, himself, was involved in the prior offense. For instance, we

---

**3.** While the indictment and the jury charge omitted the requisite mental state, requiring only that appellant commit the underlying offense as a member of a criminal street gang, we measure the evidence by the elements of the offense as they would be presented in a hypothetically correct jury charge. *Curiel,* 243 S.W.3d at 16.

have previously held in a prosecution under Section 71.02 that the probative value of evidence relating directly to a defendant's involvement in a gang and the gang's activities is not substantially outweighed by prejudicial effect. *See Robinson v. State*, No. 01–00–00908–CR, 2002 WL 188466, \*11 (Tex.App.-Houston [1st Dist.] Feb. 7, 2002, no pet.)(mem. op., not designated for publication). However, in *Robinson*, the defendant was involved in the other offenses, and this Court concluded that the evidence was probative in showing his intent to participate in organized criminal activity. *Id.* Similarly, other courts have held that "evidence of a string of similar, gang-related offenses [involving the defendant] makes it more probable that the latest of such offenses was also gang-related." *Chaddock v. State*, 203 S.W.3d 916, 924 (Tex.App.-Dallas 2006, no pet.); *see Prince v. State*, 192 S.W.3d 49, 56 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (evidence of other robberies made intent to commit robbery more probable).

In addition, evidence of a gang's character and reputation *generally,* which is usually offered through the expert testimony of a law enforcement officer familiar with the gang, has been held to be admissible under Rule 403. *See Canales v. State*, 98 S.W.3d 690, 697 (Tex.Crim.App.2003) (allowing officer's testimony about gang's philosophy). Courts have also found gang evidence admissible when it has some underlying value to show motive to commit the charged offense. *See, e.g., Medrano v. State*, No. AP–75320, 2008 WL 5050076, \*13 (Tex.Crim.App.2008) (not designated for publication) (admitting testimonial evidence explaining gang membership, relationship between rival gangs, and gang's protocol generally, as it provided motive for commission of offense between two rival gangs).

In the present case, the specific evidence of two offenses not involving appellant does not fit within either category. Unlike *Robinson, Chaddock,* and *Prince,* it is undisputed that appellant was not involved in the other offenses. Also, the evidence complained of here was not general testimony regarding the gang's character and reputation like the Court addressed in *Canales.* It also does not have strong probative force in showing motive or knowledge like in *Medrano.* The specific evidence of crimes not committed by appellant was of very little probative value, if any, to show appellant's mental state to act as part of a criminal street gang. *See Montgomery,* 810 S.W.2d at 390 (indicating that strength of extraneous offense evidence hinges on the proponent's ability to "show the opponent in fact committed the extraneous conduct").

Furthermore, the State had very little need for the evidence. The State offered a substantial amount of evidence connecting appellant to the gang, including writings, photographs, and drawings found at appellant's home. The photographs depicted appellant with known gang members "throwing gang sings." Detective Miller testified generally regarding the gang and the gang's activities, which is not complained of on appeal. The State had substantial evidence showing appellant's affiliation with the gang and the gang's mission to commit crime, indicating that the complained of evidence was unnecessary to the State's case. This factor weighs towards exclusion of the specific evidence of the two offenses that did not involve appellant.

*ii) Unfair Prejudice*

 " 'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Casey,* 215 S.W.3d at 879–80 (citing *Gigliobianco,* 210 S.W.3d at 641). The evidence must be *unfairly*

prejudicial, as virtually all evidence offered by a party to a lawsuit will be prejudicial to the opposing party. *Montgomery*, 810 S.W.2d at 378. "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Casey*, 215 S.W.3d at 880.

In the instant case, a substantial amount of time was spent detailing horrific crimes and the effects on the victims, when it is undisputed appellant was not involved and neither of the offenses were charged in the indictment. Regarding the Rose Stadium assault, Detective Miller testified that Mr. Ervin was assaulted by a group of 30 individuals and his daughter was also assaulted when she attempted to help her father. Detective Miller testified that Ervin can no longer smell or taste. This testimony evokes strong emotions. Linda Schaffer testified regarding the snatching of her purse in the broad daylight. She testified that she was never afraid of gangs before and felt safe in Tyler but as a result of the offense, she is always more cautious. The evidence of both of these offenses arouses hostility toward the defendant, despite the fact that defendant undisputedly was not involved. This factor weighs towards exclusion.

### iii) Confusion of the Issues

"'Confusion of the issues,' refers to a tendency to confuse or distract the jury from the main issues in the case." *Id.* (citing *Gigliobianco*, 210 S.W.3d at 641). "Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues." *Id.*

Because the testimony and evidence relating to the commission of the Rose Stadium assault and the purse snatching took up a substantial amount of the State's case-in-chief as well as closing arguments,

the jury could have mislead in their consideration of the evidence. This factor weighs towards exclusion.

### iv) Undue Delay and Needless Presentation of Cumulative Evidence

"'Undue delay' and 'needless presentation of cumulative evidence' concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision." *Id.* (citing *Gigliobianco*, 210 S.W.3d at 641). Even aside from the threat of improper consideration of the evidence, the sheer volume of evidence on offenses unrelated to the charged offense was a waste of time. This factor weighs towards exclusion.

We conclude that any probative value of the two offenses was substantially outweighed by the countervailing factors. *See id.* at 884–85 (upholding court of appeal's conclusion that evidence of extraneous bad acts was inadmissible); *see also Montgomery*, 810 S.W.2d at 389, 397 (holding that trial court abused its discretion in concluding that the probative value outweighed prejudice and admitting evidence that "appellant frequently walked around naked, with an erection, in the presence of his children" in prosecution of the appellant for indecency with a child). We conclude that the trial court's admission of the evidence from the purse-snatching and the Rose Stadium assault, including the photos relating to the assault, was outside the zone of reasonable disagreement and, thus, it erred in admitting this evidence over proper objection. *See Casey*, 215 S.W.3d at 884–85; *Montgomery*, 810 S.W.2d at 389, 397.

### Handgun

At trial, the State offered a semi-automatic pistol that was recovered during a search of appellant's residence in May 2007, a year before the charged offense. When the pistol was offered into evidence,

appellant's trial counsel objected on relevance grounds, explaining that the firearm used in the charged robbery was a revolver and the handgun being offered was a semi-automatic pistol. The State offered no theory of admissibility or explanation of relevance at trial. The judge responded to appellant's objection by saying he "underst[oo]d that objection" but overruled the objection and admitted the handgun because the court found the evidence to be relevant to the "elements that the State must prove, the criminal street gang" and "the violence of these continuing criminal activities that the street gangs engage in[.]"

On appeal, the State asserts that because of the State's burden to show that appellant committed the offense as a member of a criminal street gang, some evidence of the gang's prior offenses, including appellant's ownership of the gun, was relevant. However, the State points to no authority supporting the argument that an individual's possession of a handgun a year prior to a charged offense is relevant in establishing that individual's membership in a criminal street gang and propensity to commit violent crimes.

The Texas Court of Criminal Appeals has held that, in the absence of some relevance to a disputed issue in the case, it is error for a trial court to admit a weapon that was not used in the commission of the charged offense during the guilt phase of trial. *Cobb v. State*, 85 S.W.3d 258, 272 (Tex.Crim.App.2002) (holding that trial court erred in admitting five knives, none of which were murder weapon knife, during guilt phase of trial). The Court in *Cobb* held that such evidence was "irrelevant at the guilt stage of the trial." *Id.* The facts of the present case are similar to those in *Cobb*. Following *Cobb*, we hold that the handgun was inadmissible during the guilt phase of the trial. *Id.; see also*

*Peters v. State*, 93 S.W.3d 347, 352–53 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (holding that evidence of firearm and marijuana found in defendant's car had no proper purpose when issue at trial was whether consent to search hotel room existed). As the Court held in *Cobb*, "[e]ven if marginally relevant, the evidence should have been excluded at the guilt stage under Rule 403 as unfairly prejudicial when compared to its purported probative value." 85 S.W.3d at 272.

### 6. Harm Analysis

Even though we have decided the court erred in admitting the evidence, our inquiry does not end there; we must determine whether the error requires reversal. A trial court's erroneous admission of evidence constitutes non-constitutional error. *Fox v. State*, 115 S.W.3d 550, 563 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) ("misapplication of the rules of evidence is not constitutional error"); *see Casey*, 215 S.W.3d at 885; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App.2002). Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that an appellate court must disregard a non-constitutional error that does not affect the substantial rights of the defendant. Tex.R.App. P. 44.2(b); *Casey*, 215 S.W.3d at 885. Under Rule 44.2(b), an appellate court may not reverse for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not have a substantial and injurious effect or influence in the jury's determinations as to the defendant's guilt or punishment. *Casey*, 215 S.W.3d at 885 (citing *Garcia v. State*, 126 S.W.3d 921, 927 & n. 9 (Tex.Crim.App.2004)); *King v. State*, 953 S.W.2d 266 (Tex.Crim.App.1997) (evaluating error's influence on jury's determination of punishment).

We review harm under the standard applicable to non-constitutional error. *See Casey,* 215 S.W.3d at 885.

### a) Factors

In making this assessment we consider "everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla,* 78 S.W.3d at 355 (citing *Morales v. State,* 32 S.W.3d 862, 867 (Tex.Crim.App.2000)). Additionally, if material to appellant's claim, we may consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments and even voir dire. *Id.* at 355–56. We also consider whether the State emphasized the error. *Id.* at 356.

### i. Evidence Admitted for the Jury's Consideration

In this case, the trial court erred in admitting evidence during the guilt or innocence phase of trial. In assessing punishment, the jury may consider all evidence adduced during the guilt or innocence phase of the trial, in addition to the evidence presented at the punishment phase, so we must evaluate whether the error effected the jury's determination of guilt and assessment of punishment. *See King,* 953 S.W.2d at 272.

The evidence complained of here would also be inadmissible in the punishment stage of trial. While courts have allowed the admission of gang evidence during punishment phase, none have allowed evidence of specific bad acts that the defendant was undisputedly not involved in. *See Beasley v. State,* 902 S.W.2d 452, 456–57 (Tex.Crim.App.1995) (allowing admission of evidence regarding a defendant's membership in a gang if it did not link the accused to the bad acts or misconduct generally engaged in by gang members); *Sierra v. State,* 266 S.W.3d 72, 79–80 (Tex. App.-Houston [1st Dist.] 2008, no pet.). In *Sierra,* we found that the trial court did not err in admitting the testimony of a police officer during the punishment phase where the officer testified to his familiarity with the gang and his opinion that the defendant was a member. 266 S.W.3d at 77. After overruling a Rule 403 objection, the Court allowed the officer to testify to his conclusion that Sierra was a gang member, which was based on Sierra's admission, identification by a reliable person, and he was arrested with an associate who was a known gang member. *Id.* Additionally, the trial court in *Sierra* allowed the officer to testify that the nature of the gang was a "criminal enterprise" used for "drug trafficking, robberies, murders[, and] ... all kinds of criminal activity." *Id.* at 78. The officer conceded that, although he believed Sierra was a gang member, he did not know the extent of his involvement in the gang. *Id.* In holding that the evidence in *Sierra* fell under the type of "bad acts" relevant to sentencing, this Court noted that the trial court provided a proper instruction limiting the jury's review of evidence in the punishment phase to those bad acts which the State proved beyond a reasonable doubt were committed by Sierra or were acts which Sierra could be held criminally responsible. *Id.* at 79–80.

 While the general character or reputation of a gang and evidence of a defendant's membership is relevant to show the character of the defendant in a means that is relevant for assessing punishment during the punishment phase of the trial, the evidence admitted in the present case is notably different. *See id.*

In presenting detailed, inflammatory evidence relating to crimes not involving appellant, there was an inherent risk that the jury might hold appellant accountable for those offenses. For instance, Detective Miller testified that, as a result of the Rose Stadium assault, the victim lost the ability to smell or taste. This type of impact testimony is inadmissible.

Generally, evidence of the impact of an offense on the life of the victim and others can be introduced at the punishment phase of a criminal trial as a way of informing "the sentencing authority about the specific harm caused by the crime in question." *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *see also Haley v. State,* 173 S.W.3d 510, 517 (Tex.Crim.App.2005); *Stavinoha v. State,* 808 S.W.2d 76, 79 (Tex.Crim.App.1991) (holding that relevant victim impact evidence may include the physical, psychological, or economic effects of a crime on victim or victim's family). To be admissible the evidence must have "some bearing on the defendant's personal responsibility and moral culpability." *Haley,* 173 S.W.3d at 517. Extraneous victim impact evidence by victims not named in the indictment is inadmissible because such evidence runs the risk of extreme prejudice and can lead to an unfair punishment hearing. *Id.* at 518 (citing *Cantu v. State,* 939 S.W.2d 627, 637 (Tex.Crim.App.1997)). Such evidence is irrelevant under Rule 401 and any probative value is substantially outweighed by unfair prejudice. *Id.; see* Tex.R. Evid. 401, 403.

In *Haley,* the Court of Criminal Appeals held that error in admitting the extraneous victim impact evidence had a substantial effect on the jury's verdict. 173 S.W.3d at 518. Notably, the inadmissible testimony in *Haley* was brought in during the punishment phase and was related to a crime Haley was convicted of committing. *Id.*

The present case is even more egregious because an extensive amount of testimony and evidence was brought in during the guilt or innocence phase and related to offenses that appellant was not accused of committing. The only victim alleged in appellant's indictment was "Nickalas [sic] Graham." While the indictment alleges that appellant committed the offense "as a member of a criminal street gang," this allegation does not open the door to the admission of evidence regarding specific instances of bad conduct that appellant was undisputedly not involved in.

### ii. Nature of Evidence Supporting Jury's Verdict

Appellant does not contest the legal or factual sufficiency of the evidence supporting his conviction. Graham identified appellant by pointing him out in court. However, the record reveals some inconsistencies in the identification of appellant.

The night of the robbery, Graham told Detective Mathews that he saw the faces of Suspect 1, the man with the gun, and Suspect 2 but he did not recognize them. Graham testified that Suspect 1 was the person who he later identified at trial as appellant, Demichael Jackson. Graham admitted that he initially gave police the name of two men he thought were involved, who he referred to as "P–Dub and B–Dub." He testified that P–Dub and B–Dub stole a portable DVD player from his residence a month prior to the offense.

The record reflects the following testimony regarding Graham's initial identification of appellant:

[Appellant's Counsel]: Who came in first?

[Graham]: The defendant came in first.

[Appellant's Counsel]: Now, when you say "the defendant," do you know his name?

[Graham]: Demichael Jackson.

[Appellant's Counsel]: Okay. And did you know his name on May the 29th?

[Graham]: No, I didn't.

[Appellant's Counsel]: Had you ever seen him before?

[Graham]: Never before.

[Appellant's Counsel]: When you said— when did you first identify him or learned that he was Demichael Jackson?

[Graham]: Well, actually, some my friends had told me about it. A few of the guys that were at my house that night at the poker game had gone to school with him the majority of their lives. And when they found out that he had been arrested and that he was the one that had done it, they told me who he was.

[Appellant's Counsel]: That kind of put two and two together when they told you; then you figured out, okay, this is what that's all about?

[Graham]: Yeah.

After further questioning, Graham testified that he identified appellant in a photo lineup a day after the robbery, weeks before talking to his friends about appellant's name. However, Graham provided other testimony that conflicted with this sequence of events. Graham testified that he worked at Game Exchange, and when his co-workers saw a black man come into the store wearing Graham's backpack the day after the robbery, they contacted him. The person wearing the backpack at Game Exchange was appellant.

At trial, Jacob Jones, Monica Daniel, and Andrew Stanley identified appellant by pointing him out in the courtroom. Chris Bunce also pointed out appellant at trial, but admitted the closest he ever got to appellant on the night of the offense was about 15 or 20 feet and it was dark. Bunce admitted he did not remember what appellant was wearing, the color he was wearing, or if he had anything on his head or covering his face. Bunce testified he saw appellant for "probably just five, ten seconds" and there were no streetlights in that area. When Bunce initially talked to police he told them that he would not be able to identify the man with the gun. However, he explained that he was able to identify appellant in a photo lineup based on appellant's "size and stature" and he mainly identified him by "height and weight."

The jury had questions about the identification testimony, as evidenced by its note during deliberations asking for the "Transcript of Nicholas Gram's testimony where he talked to the police and his photo lineup of identification."

The other evidence linking appellant to the charged offense was the testimony of co-defendant, Jaszman Mitchell. Mitchell admitted to lying to the police and repeatedly changing his story regarding the events in question. Mitchell admitted that after providing police with information his bond was reduced from $750,000 to $50,000.

Mitchell testified that before the robbery at Graham's house, he and the other co-defendants, but not appellant, were stealing from garages and stole a woman's purse. He and the other co-defendant's, but not appellant, used the credit card from the purse at gas stations. Mitchell and the other co-defendant's are shown on gas station surveillance video using the cards without appellant. Mitchell testified that appellant joined them later to commit the robbery of Graham's home, and then appellant went home while the others took the credit cards from the Graham robbery and used them at Wal-mart. The other co-defendants, but not appellant, are shown on Wal-mart surveillance tape in the hours following the Graham robbery.

The only surveillance video of appellant with the co-defendants is from Game Exchange the day following the Graham robbery.

The trial court's instruction in the punishment phase directed the jury to consider punishment between 5 and 99 years or life imprisonment and up to a $10,000 fine. Because appellant had never been convicted of a felony, he made an application for community supervision. Appellant's sister testified in the punishment stage that appellant's mother died when he was about ten years old, that appellant was not a violent person, that appellant was not a member of a gang, and asked the jury to give him another chance. Appellant was 17 years old at the time of the alleged offense, and the defense asked the jury for leniency. The jury assessed punishment at 60 years' imprisonment, toward the maximum punishment of the statutory range, and the maximum fine of $10,000.

### iii. Character of Error in Connection with Case

As noted, the evidence connecting appellant to the charged offense was subject to impeachment by the defense, yet the jury assessed a lengthy sentence. At trial, almost half the testimony and evidence related to the offenses not involving appellant.

The court's instruction at the guilt or innocence phase provided:

> You are instructed that if there is any testimony before you in this case regarding the defendant or others having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant or others committed such other offenses, if any were committed and even then you may

only consider the same in determining the existence of a criminal street gang, if any, in connection with the offenses, if any, alleged against him in the indictment in this case, and for no other purpose.

The court's instruction at punishment was somewhat different and did not address how to treat evidence of extraneous acts committed by others. The instruction provided:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed.

The prosecutor gave an opening remark at the punishment phase telling the jury, "Now, you get to hear the rest—you get to hear everything else. In the sentencing phase, you can consider not only the facts that you've previously heard, but unlike in the guilt/innocence phase, when you heard evidence of the other bad acts by the gang, you can consider that now in deciding what a just and appropriate sentence is."

During the punishment phase, the State brought in appellant's prior adjudications of delinquent conduct committed when he was a minor. The defense called appellant's sister, Jackie Orange, to testify in the punishment phase. Orange attempted to explain the circumstances of one of appellant's adjudications. Orange testified that she was familiar with what happened, but when Orange began to explain the circumstances, the prosecutor objected "to this line of questioning" without further explanation. The objection was sustained by the judge, and Orange was prevented

from explaining the circumstances of appellant's adjudication of juvenile delinquency. When appellant's trial counsel objected to the State's going into specific extraneous offenses during the guilt or innocence phase, the trial judge overruled all of the objections.

In closing argument during punishment phase, the prosecutor emphasized the inadmissible evidence, stressing that appellant deserved a life sentence. Referencing the Rose Stadium assault, the prosecutor argued, "I think it's safe to say that since Christopher Ervin's encounter with the Westside Crips Rolling Sixties, now he can't taste. He's going to remember that for the rest of his life. Jonnell Ervin is going to remember laying on her father to keep them off for the rest of her life." Additionally, the prosecutor referenced the purse-snatching, arguing "And I'm going to go back to what Linda Schaffer told you. 'It's a lot different reading about it in the newspaper than when it happens to you.'" The prosecutor spent more time in closing talking about the facts of these unrelated offenses than the charged offense.

When the State initially addressed the admissibility of the evidence of the two other offenses in the pre-trial hearing, the prosecutor argued that the State needed the evidence to prove that appellant was a member of a criminal street gang. The prosecutor argued, "At no point in time am I going to stand up and argue, well, you know, you have to be able to judge the defendant's character because these people did all this other stuff." Contrary to the prosecutor's assurance to the court in the pre-trial hearing, that is exactly how the State used the evidence when the prosecutor emphasized the offenses in his closing argument in the punishment phase.

Given the substantial amount of time at trial focused on these inadmissible offenses and the State's extended argument concerning the victims of those offenses, we cannot say that the error did not have a substantial effect and influence on the jury's determination of guilt and punishment. *See Haley*, 173 S.W.3d at 519 (noting "State's extended argument concerning the suffering" of victim of extraneous offense and holding error was harmful). The record shows that the evidence of the two unrelated offenses was a prominent piece of the State's argument for conviction and a weighty sentence. Similar to the error in *Haley*, we cannot relegate the pervasive and prejudicial characteristics of the impermissible testimony and evidence, especially in the manner in which it was used, to the benign category of harmless error. *See id.* at 519.

We sustain appellant's first issue. Accordingly, we need not reach appellant's second issue on appeal.

## Conclusion

The trial court erred in admitting the specific evidence relating to two offenses not involving appellant, photographs from one of those offenses, and a handgun unrelated to the charged offense. The improper admission substantially affected the jury's verdict. Therefore, we reverse the judgment of the trial court and remand to the trial court for a new trial.