**Opinion issued December 14, 2017**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00766-CR

————————————

**ARLIN WALBERT BARRIENTOS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 208th District Court**
**Harris County, Texas**
**Trial Court Case No. 1414140**

## O P I N I O N

A jury convicted appellant, Arlin Walbert Barrientos, of the first-degree

felony offense of murder and assessed his punishment at fifty years' confinement.[1]

---

[1]  *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

In two issues, appellant contends that (1) the State failed to present sufficient evidence that he committed the offense of murder under the law of parties, and (2) the trial court erroneously admitted evidence of gang activity and appellant's gang affiliation during the guilt-innocence phase of trial.

We affirm.

## Background

### A.    *Factual Background*

On January 4, 2014, Nicholas Perez and another unnamed individual celebrated their respective birthdays by having a house party on Nyoka Street, a street with a mixture of industrial properties, businesses, and residences in northwest Houston.  The party was well attended, with people socializing, drinking, and smoking both inside of the house and in the front yard, which was surrounded by a chain-link fence.  One of Perez's long-time friends, the complainant Wayland Clark, attended the party, and he spent time with Perez "just having fun and drinking."

After midnight, Perez and Clark walked through the gate in the fence surrounding the yard to Perez's car, and Perez heard gunshots.  Perez could not tell where the gunshots were coming from, but he ducked down and grabbed his own pistol from his waistband.  A bullet grazed Perez in the arm and back, and two other bullets hit Clark in his neck and lower abdomen.  Clark later died from his injuries. Perez ran toward Nyoka Street, and he saw a car quickly pulling out of a parking lot

adjacent to the house and driving down the street. Perez testified that "the first thing that came to my mind was that car is driving off fast," and he ran a little way after the car and fired his pistol into the air.

Dakotah Drakeford learned about the party on Nyoka Street from social media. She arrived around 9:30 or 10:00 p.m. She testified that to get to the house partygoers had to enter through a gate in the fence surrounding the front yard. She did not witness anyone arguing during the course of the party. At one point in the evening, she was outside and standing near the front porch of the house when she heard gunshots coming from the parking lot area next to the house. Drakeford did not see who fired the gunshots. She stated that she did not believe the shooter was on foot because she heard five or six gunshots immediately followed by a car pulling away very quickly. She did not see what kind of car quickly drove off.

Miguel Preza also learned about the party from social media. There was a large crowd of people inside the house, and Preza went outside to smoke a cigarette. As he stood about five feet from the gate inside the front yard, "They started shooting and [he] started running and [he] got shot." Preza did not see who fired the gunshots, but he did see a muzzle flash coming from the parking lot. Preza was shot in the arm and lost consciousness. Other than remembering that there were a "bunch" of shots fired, Preza could not remember anything else about the shooting.

3

Aaron Clark, one of Wayland Clark's younger brothers, also attended the party. Aaron did not see anyone argue or fight at the party, and he did not see anyone with a weapon. At one point, Aaron stood outside near the corner of the house with some friends, drinking and talking. He later saw Wayland come outside with Perez. Wayland told Aaron that they were going to Perez's car to get a liquor bottle from the trunk. Aaron stayed near the corner of the house, and then he heard six or seven gunshots and saw "some fire in the sky." Aaron could tell that the gunshots were coming from the front of the parking lot next to the house, but he could not see anything else concerning the shooter. Aaron found his younger brother Brian, who was inside the house and got him away from the scene, and he then discovered Wayland lying on the ground in the parking lot, unresponsive and not breathing. Aaron stayed with Wayland until EMS arrived at the scene.

## B.    The Police Investigation

Houston Police Department ("HPD") Officer J. Butler, with the Crime Scene Unit, processed the scene of the shooting for evidence. The trial court admitted numerous photographs of the scene and the scene diagram that Officer Butler had prepared, which indicated that the house was located directly north of a small parking lot, with the gate that the partygoers used to enter the party along the north border of the parking lot. A warehouse and another building were located along the south and west borders of the parking lot, and Nyoka Street was to the east. Several

4

cars were present in the parking lot when Officer Butler arrived at the scene after the shooting, including a white van, which was parked in the middle of the parking lot almost directly south of the gate to the house.

Officer Butler recovered one fired cartridge casing located in the parking lot at the rear of the van. This was the only casing Officer Butler recovered from the scene. He agreed with the prosecutor that if someone had fired a semiautomatic weapon from inside a car parked in the parking lot, he would not expect to see any cartridge casings located outside of the vehicle. Officer Butler also observed a bullet strike on the driver's side door of the van, which faced the interior of the parking lot. He stated that it appeared from this strike that the bullet traveled in a south-to-north direction. There were also two large bloodstains located the scene—one on the front porch next to the front door to the house and the other in the parking lot by the hood of the van—and a trail of blood led north-to-south from the house into the parking lot.

HPD Investigator M. Coleman and his partner, Sergeant Odum, arrived at Nyoka Street a little after two o'clock in the morning on January 5. The business that bordered the parking lot had multiple security cameras located in different positions that faced into the parking lot, and Investigator Coleman reviewed the surveillance footage. The cameras did not record the full sequence of events that occurred on the night of the shooting because they operated on a "motion system,"

5

and the cameras did not record unless a certain amount of motion occurred within view. The trial court admitted still photographs from the surveillance footage, as well as the surveillance videos themselves.

The surveillance footage depicted a car driving north on Nyoka Street at 12:51 a.m., turning around in a different parking lot, and driving back to the parking lot located just south of the house at 12:53 a.m. The surveillance footage showed the white van that Officer Butler photographed with three cars parked to the left of it in the parking lot. The car that was of interest to Investigator Coleman turned around in the parking lot and parked behind the cars parked to the left of the van. The subject car turned off its lights. At 1:01 a.m., the surveillance video showed "some flashes of light" and "people gathered and ducking down and darting different directions" as the car pulled out of the parking lot with its headlights on and quickly drove south down Nyoka Street. Investigator Coleman could tell from the surveillance footage that the car was occupied by the driver and a front-seat passenger. He could not identify the license plate number of this car.

HPD Detective D. Arnold and his partner, Sergeant C. Sturdivant, began investigating the case on January 6, 2014, two days after the shooting occurred. Detective Arnold received a tip of two names—Randy and Evelyn—and began researching the case. During his research, he learned that the car that appeared in the surveillance footage was a 2006 Nissan Maxima owned by appellant. On

6

January 12, 2014, HPD Officer S. Borak conducted a traffic stop on a Nissan Maxima a little before 3:00 a.m. Appellant was driving this vehicle, and the occupants included Randy Larios and Evelyn Rodriguez. Officer Borak detained appellant and took him to the Homicide Division.

Detective Arnold and Sergeant Sturdivant interviewed appellant later that day. The trial court admitted an audio recording of this interview. In the interview, appellant admitted attending the house party on Nyoka Street around 9:30 with several people, including Randy Larios. The group left the party and returned to appellant's house. A few hours later, Larios asked appellant for a favor—to drive back to Nyoka Street with Larios and pick up Larios's girlfriend, who was still at the party. Appellant told the detectives that, when they arrived back at the party and were waiting for Larios's girlfriend, they saw someone walking in between cars, and Larios told him to roll down the driver's side window, which appellant did. Larios, who was sitting in the front passenger seat, then pulled out a gun from a pocket and started shooting.[2] Appellant stated that Larios knew the person walking in between cars—saying to appellant, "He's coming"—but he did not tell appellant who this person was. When asked if Larios said why he wanted to shoot this person, appellant

---

[2] The State tried Larios for his role in the shooting before appellant's trial, and a jury convicted Larios of murder. The Fourteenth Court of Appeals affirmed Larios's conviction. *See Larios v. State*, No. 14-15-00996-CR, 2017 WL 2292507 (Tex. App.—Houston [14th Dist.] May 25, 2017, no pet.) (mem. op., not designated for publication).

7

stated, "I guess because they got into some shooting like awhile ago, with the same guy, I think, at another party." Appellant stated that this other incident occurred around two months before the shooting on Nyoka Street. Appellant knew that Larios had carried a weapon with him before.

Appellant stated to the detectives that, after the shooting, he quickly drove away from the scene because he was scared and did not want Larios to shoot him as well. Appellant again stated that he believed they went back to the party to pick up Larios's girlfriend, and he thought that Larios did not tell him the real reason why he wanted to go back because appellant would not agree to take him if appellant knew there would be a shooting. Appellant stated that he took his car to be washed after the shooting, and he denied seeing any fired cartridge casings in his car. The detectives showed appellant screen shots from the surveillance footage, and appellant wrote on these pictures, "This is my Nissan Maxima 2006."

After his interview, appellant took the detectives to his house, which was located in the same part of Houston as Nyoka Street. Appellant's mother brought the detectives a .40 caliber Smith & Wesson pistol, and Evelyn Rodriguez brought them five fired shell casings contained in a glass bottle. Detective Arnold submitted this evidence for ballistics testing.

Kim Downs, a firearms examiner with the Houston Forensic Science Center, examined the weapon recovered from appellant's house, the fired cartridge casings

8

recovered from appellant's house, the fired cartridge casing recovered from the scene, and a bullet recovered from Clark's body during his autopsy. Downs testified that all of the cartridge casings and bullets recovered and tested in this case were fired from the .40 caliber Smith & Wesson pistol obtained from appellant's house.

## C.    *Evidence Concerning Gang Activity*

Throughout the trial, multiple witnesses testified concerning gang activity and the gang affiliation of several individuals involved in the shooting incident.

Investigator Coleman testified that after he and his partner viewed the surveillance footage of the scene, they determined that some of the individuals involved were gang members, so they turned the investigation over to a special unit within the HPD Homicide Division that handles gang-related murders. Detective Arnold testified that, in 2014, he was part of the "gang squad" within the Homicide Division and that he began investigating this case after the initial investigators "determined it was a gang-related episode." In addition to the names of Randy and Evelyn, Detective Arnold also received the name of a gang—SB13—in a tip, and he used HPD's Gang Tracker database to search for further information related to these names and related to the car depicted in the surveillance footage. Consulting the Gang Tracker led Detective Arnold to a 2006 Nissan Maxima, owned by appellant, that was "tied to that SB13 gang." Defense counsel did not object to any of this testimony.

9

Perez testified, without objection, that at the time of the incident in 2014, he had been affiliated with the SB13 gang and, before that, with the 52 Hoover Crips. On cross-examination, defense counsel questioned Perez concerning when and how he had become unaffiliated with a gang. Defense counsel also asked Perez if gang members had attended the house party, and Perez stated that they had.

Before the second day of testimony, the prosecutor stated to the trial court that he wished to proffer evidence that appellant was affiliated with a gang "for the sake of motive and intent" and also to show "the existence of a conspiracy" with Larios. The State argued that the motive for the shooting of Clark was "gang retaliation," pointing out that appellant had told the detectives in his interview that Clark and Larios had been involved in a prior shooting and that the jury had already heard testimony concerning gang activity and affiliation. Appellant objected, arguing that no evidence had been presented raising gang retaliation as a motive, that gang affiliation should not be used "for purposes of motive, intent, or identity," and that the evidence was more prejudicial than probative. The trial court overruled appellant's objections and allowed the State to elicit testimony that appellant and Larios were in the same gang, a gang that was a rival to Clark's gang.

Sergeant Sturdivant testified that he and Detective Arnold were assigned the case because of the "gang nexus" associated with the shooting. He stated that they developed Randy Larios and appellant as suspects and that appellant was developed

10

as a suspect after they discovered a vehicle "associated with several offense reports that were associated with a tip" they had received. He testified that appellant was a "documented Spring Branch 13 gang member" and that Larios was a member of the same gang.

Officer Borak testified that his current assignment was to patrol the Spring Branch portion of Houston, but before that, he was assigned to the gang division, where he worked to identify and document gang members. He testified that this is primarily accomplished through "self-admission" by gang members when officers encounter these individuals. Officer Borak stated that he is familiar with the SB13 and the 52 Hoover Crips gangs, and these gangs do not get along. Aaron Clark testified that both he and Wayland were affiliated with the 52 Crips gang. He did not have any knowledge about whether Perez was affiliated with a gang.

The charge included an instruction on the law of parties. The jury found appellant guilty of the offense of murder and assessed his punishment at fifty years' confinement. This appeal followed.

**Sufficiency of Evidence**

In his first issue, appellant contends that the State failed to present sufficient evidence that he committed murder under the law of parties.

11

## A. *Standard of Review*

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Griffin v. State*, 491 S.W.3d 771, 774 (Tex. Crim. App. 2016). The jurors are the exclusive judges of the facts and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). The jury, as the sole judge of credibility, may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Rivera v. State*, 507 S.W.3d 844, 853–54 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Leroy v. State*, 512 S.W.3d 540, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.). We give great deference to the jury's credibility determinations. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) ("When the record supports conflicting

inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination."). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

## B.     *Murder Under Law of Parties*

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (West 2011). A person is criminally responsible as a party to the offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." *Id.* § 7.01(a) (West 2011). A person is criminally responsible for an offense committed by the conduct of another person if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2) (West 2011); *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). Thus, to establish that appellant

13

committed the offense of murder under the law of parties, the State had to prove that appellant, with the intent to promote or assist the commission of the murder of Clark, solicited, encouraged, directed, aided, or attempted to aid Larios in commiting the offense.

To determine whether a person is a party to an offense, we may look to events "before, during, and after the commission of the offense." *Gross*, 380 S.W.3d at 186 (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). We may rely on circumstantial evidence to prove status as a party, but "[t]here must be sufficient evidence of an understanding and common design to commit the offense." *Id.* (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). Each fact need not point directly to the guilt of the defendant as long as the cumulative effect of the facts is sufficient to support the conviction under the law of parties. *Id.* Mere presence at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense. *Id.* Evidence is sufficient to convict under the law of parties "when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement." *Wooden v. State*, 101 S.W.3d 542, 546 (Tex. App.— Fort Worth 2003, pet. ref'd).

"To establish guilt under the law of parties, the evidence must show that, at the time of the offense, the parties were acting together, each contributing some part

14

towards the execution of their common purpose." *Nelson v. State*, 405 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *see Gross v. State*, 352 S.W.3d 238, 243 (Tex. App.—Houston [14th Dist.] 2011) (stating that "'acting together' need not rise to the level of agreement," but parties "must be acting together to accomplish their common purpose"), *aff'd*, 380 S.W.3d 181 (Tex. Crim. App. 2012); *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd) ("While an agreement of the parties to act together in a common design seldom can be proved by direct evidence, reliance may be had on the actions of the parties, showing by either direct or circumstantial evidence, an understanding and common design to do a certain act.").

Courts have repeatedly upheld convictions under the law of parties when the evidence establishes that the defendant participated in the commission of the offense by driving the getaway vehicle. *See Williams v. State*, 473 S.W.3d 319, 325–28 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Hooper v. State*, 255 S.W.3d 262, 266 (Tex. App.—Waco 2008, pet. ref'd); *Webber v. State*, 757 S.W.2d 51, 55–56 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd); *see also Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985) ("This Court has sustained convictions where the evidence established that the defendant participated in the commission of the offense by driving the get-away vehicle"), *overruled on other grounds by Ex parte Patterson*, 969 S.W.2d 16 (Tex. Crim. App. 1998).

Appellant argues that the State failed to present sufficient evidence that, with the intent to promote or assist in the offense, he solicited, aided, encouraged, or directed Larios to commit the offense of murder. He argues that there is no evidence that he knew, before the shooting occurred, that Larios was armed or that Larios intended to shoot Clark, and he further argues that any aid or assistance that he provided to Larios occurred only after the shooting. He also argues that using his actions in parking his car in the parking lot when he returned with Larios to the party as evidence of wrongful intent is "suggestion and speculation" and that this evidence is not sufficient to sustain his conviction. Appellant also cites the Fourteenth Court of Appeals' opinion rendering a judgment of acquittal in *Gross v. State*, a decision that was affirmed by the Court of Criminal Appeals, as support for his contention that his mere presence as the getaway driver and his possession of the murder weapon after the shooting of Clark was insufficient to establish his guilt under the law of parties. We disagree with appellant and conclude that *Gross* is factually distinguishable.

In *Gross*, the defendant was driving his brother-in-law home when the defendant and another driver he did not know, the complainant, got into a verbal altercation at a red light. 380 S.W.3d at 183. The defendant and the complainant both pulled over into a gas station parking lot, stepped out of their respective vehicles, and continued arguing. *Id.* Approximately one minute later, the

defendant's brother-in-law got out of the defendant's truck carrying a shotgun that had been stored in the truck. *Id.* The complainant ran toward the convenience store and the defendant shouted, "No, no," but the defendant's brother-in-law shot and killed the complainant. *Id.* The defendant panicked and fled the scene with his brother-in-law and the gun, and he dropped his brother-in-law, who took the gun with him, off at his grandmother's house. *Id.* at 183–84. The defendant denied involvement in the shooting when questioned by the police. *Id.* at 184.

Both the Fourteenth Court of Appeals and the Court of Criminal Appeals held that the defendant's actions were insufficient to support his conviction for murder under the law of parties. *See id.* at 186, 188–89. The Court of Criminal Appeals noted that the defendant's post-offense conduct, which included driving the getaway car from the scene, was "relevant" but could not "stand alone." *Id.* at 188. The court stated that "[t]he evidence does not indicate that [Gross] anticipated that [his brother-in-law] would shoot" the complainant and that "there is no evidence that [Gross] assisted or encouraged [his brother-in-law] to kill" the complainant. *Id.* The court held that any inference that the defendant and his brother-in-law decided to kill the complainant while driving from the red light to the gas station was based on speculation, not on evidence presented at trial. *Id.*

Here, the State presented evidence that the house party on Nyoka Street was well-attended with gang members present, including several of the people involved

17

in the shooting. The complainant, Wayland Clark, his brother, Aaron Clark, and their friend, Nicholas Perez, were all affiliated with the 52 Hoover Crips, whereas appellant and the shooter, Randy Larios, were both affiliated with SB13. The State presented evidence that these gangs are rivals and that they do not get along. The State also presented evidence, in appellant's recorded statement to the investigating detectives, that appellant was aware that Larios and Clark had had a prior altercation that involved gunfire at another party. Appellant was aware of this prior incident, he was aware that Larios owned a weapon, and he admitted being at the Nyoka Street party that Clark also attended.

In his recorded statement, appellant admitted returning to the Nyoka Street party at Larios's behest. Appellant told the detectives that Larios requested that appellant drive him back to the party so they could pick up Larios's girlfriend. However, surveillance footage of the scene showed appellant's car driving past the house at 12:51 a.m. Over the next two minutes, appellant turned around in another parking lot, drove back to the parking lot directly south of the house, parked behind several cars with almost a direct line of sight from appellant's vehicle to the gate leading to the house, and turned off the car's lights. Appellant and Larios then waited in the car for eight minutes. Neither of them went inside the house to search for Larios's girlfriend, and no one walked out to their car. At 1:01 a.m., when Clark and Perez started walking to Perez's car, Larios told appellant to roll down his

18

window, which appellant did, and Larios fired at least five shots out the driver's side window, striking several people and killing Clark. Appellant then quickly left the scene and drove back to his house. Appellant later washed his car, and he kept the murder weapon and the five fired cartridge casings at his house.

We agree with the State that the evidence here demonstrates more than appellant's mere presence at or flight from the scene. *See Gross*, 380 S.W.3d at 186. Although appellant offered an innocent explanation for his second trip to Nyoka Street that evening, it was within the province of the jury to consider this explanation in light of the other evidence—including appellant's knowledge that Larios and Clark had had a prior altercation involving gunfire; the fact that appellant and Larios were in a rival gang from Clark; appellant's knowledge that Larios had a history of carrying a gun; the fact that appellant and Larios waited in appellant's car with the lights off over eight minutes and never went into the house to find Larios's girlfriend, despite that being the ostensible reason for why they had returned to the party; appellant's rolling down his window at Larios's request when Larios saw Clark; and appellant's immediate flight from the scene after the shooting—and to discard appellant's explanation as lacking in credibility. *See Rivera*, 507 S.W.3d at 853–54 (stating that jury is sole judge of credibility and may reject all or any part of witness's testimony).

Viewing the evidence in the light most favorable to the verdict, as we must, we conclude that a rational jury could have determined, beyond a reasonable doubt, that, at the time of the offense, appellant and Larios were "acting together, each contributing some part towards the execution of their common purpose." *See Nelson*, 405 S.W.3d at 123; *see also Gross*, 380 S.W.3d at 186 (stating that we may look to events occurring "before, during, and after the commission of the offense" to determine if there was "sufficient evidence of an understanding and common design to commit the offense"). We hold that the State presented sufficient evidence that appellant was guilty of the offense of murder under the law of parties.

We overrule appellant's first issue.

## Admission of Evidence

In his second issue, appellant contends that the trial court abused its discretion in admitting evidence concerning gang activity and appellant's gang affiliation during the guilt-innocence phase of trial.

### A.     *Standard of Review and Applicable Law*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). We will not reverse unless the record shows a clear abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court abuses its discretion only

20

when the court's decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Id.*

Texas Rule of Evidence 401 provides that evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. TEX. R. EVID. 401. Evidence of a crime, wrong, or other bad act is not admissible to prove a person's character in order to show that, on a particular occasion, the person acted in conformity with that character, although this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. TEX. R. EVID. 404(b). "[G]ang membership is highly inflammatory character evidence likely to cause an individual to be convicted for being a bad person apart from sufficient indicia of guilt regarding this particular crime." *Galvez v. State*, 962 S.W.2d 203, 206 (Tex. App.—Austin 1998, pet. ref'd). However, evidence of gang membership is admissible during the guilt-innocence phase to show bias, motive, or intent, or to refute a defensive theory. *See Smith v. State*, 355 S.W.3d 138, 154 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Vasquez v. State*, 67 S.W.3d 229, 239–40 (Tex. Crim. App. 2002) (stating that "gang-affiliation is relevant to show a motive for a gang-related crime"); *Tibbs v. State*, 125 S.W.3d 84, 89 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that

21

evidence of gang membership is admissible "if it is relevant to show a non-character purpose that in turn tends to show commission of the crime").

The trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or the needless presentation of cumulative evidence. TEX. R. EVID. 403. When conducting a Rule 403 analysis, the trial court should balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest [a] decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). A trial court's decision not to exclude evidence, based on a finding that the danger of unfair prejudice does not outweigh the evidence's probative value, is entitled to deference. *See Wilson v. State*, 473 S.W.3d 889, 900 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)).

**B.      *Whether Trial Court Erroneously Admitted Evidence of Gang Activity***

Appellant argues that the trial court erred in admitting evidence concerning gang activity and affiliation from three witnesses. Specifically, he challenges the

trial court's rulings allowing Sergeant Sturdivant to testify that appellant and Larios were documented members of the Spring Branch 13 gang, allowing Officer Borak to testify that he is familiar with both SB13 and the 52 Hoover Crips and that these two gangs do not get along, and allowing Aaron Clark to testify that Wayland Clark was a member of the 52 Hoover Crips. Appellant argues that there was no evidence that the shooting of Clark "was committed for the gang's benefit" or that there was any link between appellant's gang membership and Clark's shooting.

As noted above, "[c]ourts have found gang evidence admissible when it has some underlying value to show motive to commit the charged offense." *Jackson v. State*, 314 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "Evidence showing motive to commit murder is a significant circumstance indicating guilt, and it is therefore relevant and admissible." *Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Here, the State's theory of the case was that Larios murdered Clark, a member of a rival gang, because they had previously been involved in an altercation involving gunfire at another party two months prior to Clark's death and that appellant, who was a member of the same gang as Larios, assisted him by driving Larios back to the house party. Appellant stated in his recorded interview that he was aware of the prior incident between Larios and Clark.

23

Contrary to appellant's assertion, for the evidence of gang activity and affiliation to be admissible, the State was not required to demonstrate that the shooting of Clark or Larios's prior altercation with Clark "were committed at the direction of anyone involved in SB13, or that [the shooting] was committed for the gang's benefit." Instead, gang evidence is admissible "when it has some underlying value to show motive to commit the charged offense." *Jackson*, 314 S.W.3d at 128; *Tibbs*, 125 S.W.3d at 89 (stating that gang evidence is admissible "if it is relevant to show a non-character purpose that in turn tends to show commission of the crime"); *see also* TEX. R. EVID. 401 (providing that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action"). The only evidence of motive that the State presented at trial was that appellant and Larios were members of the SB13 gang, that Clark was a member of the 52 Hoover Crips gang, that these gangs were rivals and did not get along, and that Larios had had a prior altercation with Clark that had involved gunfire. Evidence that the shooter, Larios, and the driver, appellant, were members of rival gang from the deceased, Clark, and that Larios and Clark had a history involving a prior altercation helped explain Larios and appellant's actions and provided evidence of motive. *See Jackson*, 314 S.W.3d at 128; *Lopez*, 200 S.W.3d at 251. We therefore conclude that evidence of gang activity and affiliation was relevant. *See* TEX. R. EVID. 401; *Smith*, 355 S.W.3d at

24

154 (holding that evidence of gang membership is admissible during guilt-innocence phase to show motive).

Appellant also contends that the prejudicial effect of this evidence substantially outweighed its probative value, in violation of Rule 403. However, as we have discussed, the evidence of appellant's, Larios's, and Clark's gang affiliation provided the only evidence of motive for the shooting, and therefore the evidence had strong probative force and the State had great need of the evidence. *See Gigliobianco*, 210 S.W.3d at 641. Although motive is not an essential element of the offense, it is "a significant circumstance indicating guilt, and it is therefore relevant and admissible." *Lopez*, 200 S.W.3d at 251; *see Guevara*, 152 S.W.3d at 50. This evidence relevant to motive, therefore, would not have a strong tendency to confuse the jury or distract it from the main issue in the case—whether appellant acted as a party to Larios's shooting of Clark.

Moreover, evidence concerning gang activity had already been admitted in the trial, without objection, before defense counsel objected to evidence of appellant's and Clark's gang affiliation. Nicholas Perez testified that he had been affiliated with the 52 Hoover Crips at the time of the shooting in 2014, and he also testified, in response to a question from defense counsel, that gang members were present at the house party on Nyoka Street. Investigator Coleman and Detective Arnold both testified that the general HPD Homicide Division handled the

investigation of Clark's shooting before passing the case off to the specialized "gang squad" in the Homicide Division once the detectives determined that the shooting was related to gang activity. Detective Arnold also testified to his use of HPD's Gang Tracker database to help him develop a tip that he had received, and he testified that the Gang Tracker led him to a 2006 Nissan Maxima that was "tied to that SB13 gang" and that was owned by appellant and seen in the surveillance footage of the scene just before and after the shooting.

Evidence of appellant's and Clark's gang affiliations took little time to develop, with Sergeant Sturdivant briefly testifying that appellant and Larios were both affiliated with Spring Branch 13, Aaron Clark briefly stating that Wayland Clark was affiliated with the 52 Hoover Crips, and Officer Borak briefly testifying that he was familiar with both Spring Branch 13 and the 52 Hoover Crips and the gangs did not get along. The State did not elicit any testimony concerning the general bad character of the gangs or the types of criminal activities that members of the gangs generally committed. Thus, we cannot conclude that the evidence of appellant's and Clark's gang affiliations was unfairly prejudicial. *See Maldonado v. State*, 452 S.W.3d 898, 904 (Tex. App.—Texarkana 2014, no pet.) ("Rule 403 does not mandate the exclusion of all prejudicial evidence; rather, its narrow focus is on that evidence with the potential for *unfair* prejudice.") (emphasis in original).

26

We therefore conclude that the trial court did not abuse its discretion when it determined that the prejudicial effect of the evidence of appellant's and Clark's gang affiliations did not substantially outweigh the probative value of this evidence. We hold that the trial court did not violate Rule 403 in admitting this evidence.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Brown, and Lloyd.

Publish. TEX. R. APP. P. 47.2(b).