**Opinion issued December 17, 2024**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

### NO. 01-23-00370-CR

———————————

### DAVE'ON THOMAS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

### On Appeal from the 182nd District Court
### Harris County, Texas
### Trial Court Case No. 1631872

---

### MEMORANDUM OPINION

Dave'on Thomas was convicted by a jury of murder under the law of parties.

*See* TEX. PENAL CODE §§ 7.01; 19.02. He was sentenced to 50 years' imprisonment.

On appeal, he argues that the evidence was insufficient to support his conviction. He

also contends that the trial court erred in admitting evidence that the car driven

during the murder had been stolen at gunpoint. Finally, he argues that the trial court abused its discretion by admitting cumulative evidence of his gang affiliation. We affirm.

## Background

At noon on November 13, 2018, Delindsey Mack left Lamar High School and walked toward his usual meeting spot to wait for his uncle to pick him up, as he did every day. Keona Mounton walked out with Mack but abruptly turned around and went back inside before Mack got to the street. A black Subaru pulled up on the street where Mack was standing. Two masked men with guns shot at Mack from inside the car. They then got out of the car and fatally shot him at close range. Once the shooters returned to the Subaru, the driver sped away.

In 2019, Thomas was arrested and charged as a party to murder. The State's theory was that Thomas and Mack were members of rival gangs and that Thomas had planned the murder and driven the getaway car with Kendrick Johnson, who was one of the shooters. The case proceeded to a jury trial.

During trial, Mack's uncle testified that Mack had a new girlfriend a few weeks before the murder. The uncle testified that he picked up Mack after school each day and that he always met Mack at the same spot on the street. The jury heard from a bystander parked in a nearby parking lot who heard gunshots, saw a person shooting someone on the ground, and then saw that person get into the passenger

2

side of a car. The car sped away. The jury viewed surveillance video showing the same scene. A construction worker at the high school testified that he saw two people shooting from a car. The shooters got out of the car, stood over the person they were shooting, and continued to shoot. The two shooters then got back in the car, and the car drove away, driving past the construction worker. He identified the Subaru in pictures and testified that at the time of the shooting, the rear passenger window was covered with a black plastic trash bag pinched in the car door.

The jury heard from several law enforcement officers, many of whom had specific training and had done extensive investigation of area gangs. Detective T. Miller, an expert in gang investigations, explained that Thomas and Johnson were "hall of fame" gang members of the 100 Percent Third Ward gang ("103 gang"). Mounton was the girlfriend of a 103 gang member and associated with the gang. Mack was associated with a rival gang, Young Scott Block ("Y.S.B."), and the two gangs committed retaliatory killings against one another. November 13, the date of the murder, was known as "Brae Day," a time of heightened killing by 103 gang members to commemorate Braveon Terry, a slain 103 gang member killed by Y.S.B. in November 2013.

During Detective Miller's testimony, the jury viewed surveillance video of a Subaru with its rear window missing and covered with a black plastic bag. The car circles the block a few times before Mounton, another student, and Mack walk out

of the high school. Halfway to the street, Mounton abruptly turns around and goes back toward the school building. The black Subaru pulls up next to Mack. Two people shoot from inside the car at Mack. They then get out, stand over his body, and repeatedly shoot him. They get back in the car, and a third person driving the car speeds away. Mack was murdered about 12:17 p.m. on November 13, 2018.

The court admitted into evidence Instagram messages exchanged by people alleged to be involved in the shooting. In October 2018, Johnson and Thomas messaged about using two cars to get a "drop," or find and kill rival gang members. The day before Mack was shot, Thomas messaged other 103 gang members that he needed an outfit for "Brae Day." The jury also viewed a text message where Johnson states that the hall of fame 103 gang members are himself, "Cobi, Dman, and Bravo." Detective Miller testified that "Dman" was a nick name for Thomas and that "Bravo" referred to Braveon Terry.

Messages from Johnson's phone showed that on November 13, 2018, he instructed Mounton to lure Mack to a location where the 103 gang could murder Mack. That same morning, Johnson and Thomas sent messages to each other on Instagram.

Johnson:  SO FORSHO WE DOINTHAT???

Thomas:  FA SHIT SHOW MY GEAR IN MY BAG

Thomas:  11:15 DUDE COME ON DON'T B BS SPANZ COMIN?

4

Thomas: DUDE IM BOUTS TO COME TO ASH SHIT SOON AS I GET INA HOOD BC I NEEDA USE UR CHARGER MY SHIT BROKE N WHERE WE MEETING FAT ASS AT

Johnson: LAMAR AND CALL RAYAY CHECK ON THE WHEELS

Johnson: HOW THE BAG GONE STAY OR U ALREADY DID IT YESTERDAY?

Thomas: BC ITS GOING BE CLOSED INA DOOR BUT IM BOUTS TO MAKE THIS HOW COME ANYWAY SO SHE CAN BRING ME GET A GAS TANK

Detective Miller contextualized and interpreted the messages during his testimony before the jury. Detective Miller testified that from reviewing messages, 103 gang members referred to Mack as "Fat Ass." Detective Miller explained that Johnson and Thomas messaged to confirm their plan to find Mack at Lamar around 11:15 a.m. Thomas mentioned he had his "gear" with him, and that he was going to have a female help him get a tank of gas. Detective Miller testified that 103 gang members kept ski masks and guns in bags with them, and that "gear" meant that Thomas had his ski mask and gun. According to Detective Miller, "ash" is a slang term for "killing." Johnson told Thomas to call "Rayay" and cell records showed that Thomas made a call to a contact saved as "RAYRAY" shortly thereafter. When Johnson asked, Thomas told Johnson that he closed a bag in the door of the car so that it would stay.

Cell records showed that Johnson called Thomas at 11:16 a.m. At that time, Thomas's phone was located at the same address where law enforcement later found the car used in the shooting. There was no activity on Thomas's phone from 11:22 a.m. until 12:52 p.m. Officer E. Powell, a communications intelligence expert, testified that this would be consistent with the phone being turned off during that time.

The jury heard that law enforcement subpoenaed records from Thomas's high school and from the daycare where his child attended. The records showed that Thomas did not attend his third period class, which started at 10:13 a.m.,[1] and that his cell phone was not near his high school at that time. Thomas told police he was not at school because he left to pick up his sick child from daycare, but daycare records from that day included when the child received bottles, was changed, or took naps. The records showed that the child was present all day and not ill.

Detective Miller found videos on Mack's phone that suggested he was near Mounton in class around 8:00 a.m. The jury viewed a Snapchat video from Mack's account that showed him and Mounton together talking before school started. At the end of the video, Mack says that if something happens to him, it is because of "this

---

[1] While he was marked present for fourth and fifth periods, Detective Miller, who obtained the records, testified that attendance was not actually taken during those periods.

opp." He gestures to Mounton at the same time. Detective Miller testified that the two opposing gangs refer to each other as "opps" or "opposites."

About an hour after the murder, Thomas sent Johnson a screenshot of an Instagram post from a local news station regarding the Houston Police Department investigation of the shooting.[2] Johnson messaged that he watched the police chief speak. He messaged that the police know the car they used so they "need new wheels" and that the police knew what the shooters had on but did not have the story right. Thomas responded, "IKIK my boy [pin drop emoji]" Detective A. Bock testified that "IKIK" means "I know, I know." Detective Bock said that he has reviewed 3.5 million messages between 103 and Y.S.B. gang members, and a pin drop emoji is a symbol used by both sides to be symbolic of "a drop," or locating rival gang members for assassinations.

The investigation revealed that the black Subaru used during the shooting had been stolen about five days before the murder. Detective Miller testified that he learned that the owner of the vehicle was carjacked. A gold Camry rear ended the Subaru, and when the owner of the Subaru got out of the car, two masked men with guns pointed the guns at him, took the keys, and drove off in the Subaru. The gold Camry then drove away. The owner of the Subaru testified similarly. Cell phone

---

[2]     The news story in the screen shot mentions a black Suburban rather than a Subaru. It describes the suspects as "three young males wearing all black driving a black Suburban with the black [sic] passenger window covered with a black plastic bag."

records showed that Thomas was near the same location when the Subaru was reported stolen. He was also communicating with Johnson at that time.

The Subaru was recovered the evening after the murder. A DNA analyst testified that Thomas could not be excluded as a contributor to DNA found on the interior driver's side door of the Subaru. Police also found gun cartridge cases in the car that matched the cartridges found at the scene of the shooting. The owner of the Subaru testified that he did not have gun cartridges in his car when it was stolen.

About two weeks later, Johnson was arrested for a separate offense and found in possession of one of the firearms used to shoot Mack. The jury was informed that Johnson had been convicted of murdering Mack.

In May 2019, police interviewed Thomas. The interview was recorded, and the jury was shown portions of the video. During the interview, Thomas denied being a member of 103 gang and denied knowing Johnson, claiming he had only met him twice. He denied communicating with Johnson on November 13, 2018. Once police left the room and Thomas had been placed under arrest, he made a phone call. He told the person on the phone, "I'm not going to lie. I kind of think they caught me, like, in my lie."

The jury found Thomas guilty of murder as a party, and the trial court sentenced him to 50 years' imprisonment.

8

**Sufficiency of the Evidence**

On appeal, Thomas argues that the evidence is not sufficient to prove that he was guilty of murder as a party. We disagree.

## A.    Standard of Review

We review legal sufficiency challenges under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). Under this standard, we review "the evidence in the light most favorable to the verdict and ask whether any rational fact-finder could have found the elements of the charged offense beyond a reasonable doubt." *Fernandez*, 479 S.W.3d at 837–38. "If a rational fact-finder could have so found, we will not disturb the verdict on appeal." *Id.* at 838.

Under the Penal Code, a person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE § 19.02(b)(1). Under the Penal Code's law of parties, a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. *Id.* § 7.01(a). And a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

"To establish guilt under the law of parties, the evidence must show that, at the time of the offense, the parties were acting together, each contributing some part towards the execution of their common purpose." *Barrientos v. State*, 539 S.W.3d 482, 490 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *Nelson v. State*, 405 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd)). In determining whether the evidence is sufficient, we "may look to 'events before, during, and after the commission of the offense.'" *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)). We "may also rely on circumstantial evidence to prove party status." *Gross*, 380 S.W.3d at 186. "Each fact need not point directly to the guilt of the defendant, as long as the cumulative effect of the facts are sufficient to support the conviction under the law of parties." *Id.* "While an agreement of the parties to act together in a common design seldom can be proved by direct evidence, reliance may be had on the actions of the parties, showing by either direct or circumstantial evidence, an understanding and common design to do a certain act." *Rodriguez v. State*, 521 S.W.3d 822, 828 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *Barnes v. State*, 62 S.W.3d 288, 297 (Tex. App.—Austin 2001, pet. ref'd)).

"Evidence is sufficient to convict under the law of parties 'when the defendant is physically present at the commission of the offense and encourages its commission by acts, words or other agreement.'" *Barrientos*, 539 S.W.3d at 490 (quoting

10

*Wooden v. State*, 101 S.W.3d 542, 546 (Tex. App.—Fort Worth 2003, pet. ref'd)). "However, mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Gross*, 380 S.W.3d at 186. "Courts have repeatedly upheld convictions under the law of parties when the evidence establishes that the defendant participated in the commission of the offense by driving the getaway vehicle." *Barrientos*, 539 S.W.3d at 490; *Rodriguez*, 521 S.W.3d at 828–29 (listing cases holding same).

**B.    The evidence was sufficient to show Thomas was guilty of murder as a party.**

The record reflects that the black Subaru used during the murder had been stolen five days before the murder. Cell phone tower data showed Thomas's cell phone was near where the car was stolen at that time. Cell phone records also showed that he was communicating with Johnson at the time the car was reported stolen. The jury could reasonably infer that Thomas assisted with obtaining the getaway car for the shooting by stealing the Subaru.

The jury could also reasonably conclude that Thomas helped plan the murder. The evidence at trial included transcripts of messages between Thomas and Johnson. Detectives who were experts in Houston gang activity testified, interpreting the slang in the messages, and explaining the norms and behaviors of the gangs involved. The jury could reasonably conclude that Johnson and Thomas messaged each other four hours before the murder to confirm their plan to murder Mack. Johnson asked

11

Thomas, "Forsho we doin that???" and Thomas responded affirmatively. Thomas mentioned that he was going to come "ash," and Detective Miller testified that "ash" meant killing. Thomas stated that he had his "gear" in his bag. Detective Thomas testified that members of 103 gang kept guns and ski masks in bags, and that when Thomas referred to "gear," he meant his gun and ski mask. Thomas asked where they were meeting "Fat Ass," and Detective Miller testified that 103 gang members referred to Mack as "Fat Ass." Johnson responded that they were meeting him at "Lamar." The evidence showed that Mack was later shot outside Lamar High School. Johnson asked Thomas to call "Rayay" and to "check on the wheels." Thomas's cell phone records showed that he then made a call to a number saved with a similar name. Johnson messaged Thomas: "How the bag gone stay or u already did it yesterday?" Thomas responded that he was going to close it in a door. The jury saw photographs and heard testimony that the back window of the Subaru was broken and that it was covered with a black plastic bag, which was closed into the car door.

Detective T. Miller, an expert in gang investigations, explained that Thomas and Johnson were "hall of fame" gang members of the 103 gang. The jury also viewed Johnson's text message stating that the hall of fame members are himself, "Cobi, Dman, and Bravo." Detective Miller testified that "Dman" was a nick name for Thomas and that "Bravo" referred to Braveon Terry. Mack was associated with

a rival gang, and the two gangs committed retaliatory killings against one another. November 13, the date of the murder, was known as "Brae Day," a time of heightened killing by 103 gang members in commemoration of Braveon Terry's death. Thomas had messaged a few days before the murder that he needed an outfit for Brae Day.

Additional testimony pointed toward Thomas's involvement in the murder. Detective Miller testified that in October, a month before the murder, Thomas and Johnson had a conversation on Instagram where Thomas provided instructions on how cars could be driven in a drive by shooting to easily execute rival gang members. DNA evidence showed that Thomas could not be excluded as the contributor to DNA found on the interior driver's side door of the Subaru. Surveillance video showed the shooters getting back into the Subaru after Mack was shot. The Subaru then drives quickly away from the scene.

High school attendance records showed that Thomas was present in class for first and second period on November 13, 2018. He was absent for third period, beginning around 10:15 a.m. Detective Miller testified that Thomas initially told him that he left school that day to get his sick child from daycare. Detective Miller obtained records from the daycare, showing when bottles, diaper changes, and naps occurred throughout the day. Thomas's child was not sick on November 13 and was at daycare for the day. Cell phone tower data showed that on the day of the shooting,

at 11:15 a.m., Thomas was near the same address where the Subaru was eventually recovered after the shooting. A communications intelligence expert testified that Thomas's cell phone had no activity from 11:22 a.m. until 12:52 p.m. The expert stated that this is consistent with the phone being turned off during that time.

On the day of the shooting, at around 1:30 p.m., a little more than an hour after Mack was murdered, Thomas sent Johnson a screenshot of a news station's update about the shooting. The update mentions that the car involved had a black plastic bag covering a rear passenger window. Johnson responded that the police knew the car so "we need new wheels" and that police knew what they had on at the time of the murder. Thomas messaged Johnson, "IKIK my boy [pin drop emoji]." Detective Miller testified that 103 gang members refer to locating and then killing a rival gang member as "getting the drop on" the rival gang member. The jury could infer that the pin drop emoji sent by Thomas referred to a killing. Cell phone records showed that on the day of the shooting, Thomas was at the location that the Subaru was recovered both before and after the murder.

Finally, the evidence included a video of Thomas's interview with police detectives in May 2019. Near the end of the video Thomas is alone in the interrogation room. He makes a phone call and tells someone that the only evidence the police have is his Instagram messages and says: "I'm not going to lie . . . . I kind of think they caught me, like, in my lie."

The jury reasonably could have found that Thomas was guilty of murder under the law of parties because there was evidence that Thomas helped obtain and prepare the getaway car used in the murder, helped maneuver the car during the murder, or drove the getaway car from the scene. Considering the evidence in the light most favorable to the verdict, a reasonable factfinder could conclude that Thomas was guilty of murder as a party.

We overrule Thomas's issue regarding the sufficiency of the evidence.

## Admission of Evidence

Thomas's remaining two issues concern the admission of evidence. In his first issue, Thomas contends that the trial court erred by admitting evidence of an extraneous offense. He argues that the evidence was not admissible under Rule 404(b) and should have been excluded under Rule 403. In the next issue, he argues that the trial court erred by admitting "voluminous" evidence of the activities of the 103 gang in violation of the same rules.

## A. Applicable Law

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.

15

Crim. App. 1990). A trial court's decision to admit evidence will be upheld if it is "within the zone of reasonable disagreement." *Devoe*, 354 S.W.3d at 469.

Texas Rule of Evidence 404(b) expressly provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of the defendant to show he acted in conformity therewith. TEX. R. EVID. 404(b)(1). Extraneous offense evidence may be admissible, however, for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.* 404(b)(2). Even if evidence is admissible under Rule 404, the trial court may exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403.

A trial court's ruling on the admission of extraneous offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We will uphold a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling, even if the trial court gives the wrong reason for the right ruling. *Id.*

**B.     Extraneous Offense Evidence**

Thomas contends that the trial court erred by admitting evidence of an extraneous offense. The evidence at trial included that the Subaru used during the murder was stolen at gunpoint a few days before the murder. On appeal, Thomas argues that while evidence that the car was stolen in the days before the murder was admissible and relevant, evidence that "[the complainant] was the victim of an aggravated robbery carjacking with guns is both not relevant and highly prejudicial to appellant."

At a pretrial hearing, the trial court ruled that the parties could refer to the fact that the Subaru was stolen at gunpoint but could not use the phrase "aggravated robbery." At trial, the State asked Detective Miller about his investigation of the Subaru used in the murder. Thomas's counsel approached the bench to determine what evidence the State was attempting to offer. After a brief discussion between counsel, testimony continued. Detective Miller testified that his investigation revealed that five days before the murder, the Subaru was taken from its owner at gunpoint. The driver was rear ended at night. When the driver stopped and got out of the car, someone pointed a gun at him and took the car. Defense counsel never objected during this portion of Detective Miller's testimony.

The State also called the owner of the Subaru to testify. He testified that he was rear ended in the Subaru by a gold Camry in November 2018. Two people

17

wearing masks got out of the Camry, pointed guns at him, took his car keys, got in his car, and drove off. The driver of the Camry also sped off. Thomas's counsel did not object during the testimony.

The next day, Thomas's counsel stated that he was objecting again to the "11/9 incident," arguing that the evidence of aggravated robbery was inadmissible as substantially more prejudicial than probative and a violation of Thomas's due process rights. The trial court overruled the objection. Thomas's counsel asked for a running objection, and the court agreed.

To preserve error, a party must object each time inadmissible evidence is offered or obtain a running objection. *James v. State*, 506 S.W.3d 560, 566 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see also* TEX. R. APP. P. 33.1(a)(1) (providing that party does not preserve an issue for appellate review if he fails to object in trial court at time evidence is offered). On appeal, Thomas claims his trial counsel made an objection to evidence of the aggravated robbery, but the brief cites only to the pretrial motion in limine hearing. A motion in limine does not preserve an issue for appellate review. *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("A motion in limine . . . is a preliminary matter and normally preserves nothing for appellate review.").

At oral argument, Thomas's counsel argued that trial counsel's objection made before opening statement preserved the issue for our review, but the record

reflects that trial counsel objected only to the State mentioning the extraneous offense of "aggravated robbery" during the opening statement that immediately followed. Trial counsel did not make contemporaneous objections to testimony that the car was taken at gunpoint during Detective Miller's or the owner's testimony. When counsel objected the next day to the "11/9" incident," the objection was untimely. "If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited." *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008). Thomas did not preserve this issue for our review.

## C. Gang Affiliation Evidence

Thomas also argues that the trial court abused its discretion in admitting cumulative evidence concerning Thomas's gang activity and affiliation. He contends that the "voluminous" evidence of the activities of the 103 gang was extremely prejudicial. He concedes that the State did have "some need" to present Thomas's and Johnson's 103 gang membership, but he argues that the amount of gang evidence was cumulative, and the time spent on it was substantially more prejudicial than probative. Thomas also contends that the gang was needlessly presented as a "super violent gang involved in violent extraneous conduct" and that the evidence should have been presented in a less prejudicial manner.

19

This issue is inadequately briefed because Thomas' brief does not contain appropriate citations to the record. TEX. R. APP. P. 38.1(i). Thomas states in his brief that gang-related evidence was presented through several specific law enforcement officers and through "all of the evidence exhibits offered and admitted through these officers." But rather than identify the specific evidence he complains about, he cites to the reporter's record volumes for all the trial testimony.

Thomas admits that gang-affiliation evidence was admissible, but he argues that the cumulative effect of the evidence was prejudicial. He does not state which pieces of evidence or which testimony was substantially more prejudicial than probative. *See* TEX. R. EVID. 403. He does not state at what point during the trial the gang evidence became cumulative or overly prejudicial. He likewise does not cite to specific times in the record where trial counsel objected to the admission of gang-related evidence and the objection was overruled. TEX. R. APP. P. 33.1(a) (providing that to preserve error for appeal, appellant must object in trial court and trial court must rule on request).

Even if Thomas had properly briefed and preserved the error, the trial court did not err in admitting evidence of Thomas's gang affiliation. Gang evidence is admissible "when it has some underlying value to show motive to commit the charged offense." *Barrientos*, 539 S.W.3d at 494 (quoting *Jackson v. State*, 314 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2010, no pet.). "Evidence showing

20

motive to commit murder is a significant circumstance indicating guilt, and it is therefore relevant and admissible." *Barrientos*, 539 S.W.3d at 493 (quoting *Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Thomas's affiliation with the 103 gang was relevant to show motive and intent for a gang-related crime. The record reflects that after Thomas's counsel first objected to the use of gang-affiliation evidence, the trial court urged the State to reduce the number of photos offered as evidence to show gang affiliation. After a brief recess, the State offered fewer pictures into evidence, and the trial court considered Thomas's objections based on Rule 403 to each individual photograph. The court noted that the State had reduced the number of photographs and allowed seven photographs into evidence over Thomas's objections. To violate Rule 403, evidence must be more than just prejudicial, it must be unfairly prejudicial. *See* TEX. R. EVID. 403. In this case, the trial court did not err in finding that the probative value of gang-affiliation evidence was not substantially outweighed by the danger of unfair prejudice.

We overrule Thomas's issues related to the admission of evidence.

## Conclusion

We affirm the judgment of the trial court.

Peter Kelly<br>
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).