

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00027-CR

———————————————

JERMEY SHOUN MYERS AKA JEREMY SHOUN MYERS, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1433128D

Before Sudderth, C.J.; Meier and Kerr, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

A jury found that Jermey Shoun Myers committed capital murder, the trial court sentenced him to life without parole as required by law, and Myers appealed. *See* Tex. Penal Code Ann. §§ 12.31(a)(2), 19.03(a)(2) (West Supp. 2018). In a single issue, Myers contends that the trial court erred by declining to instruct the jury on the lesser-included offense of murder because there was evidence from which the jury could have rationally concluded that he did not participate in the victim's kidnapping—the aggravating offense that turned her murder into capital murder. We hold that the trial court did not err, and so we affirm.

## I. Background

In the indictment, the State alleged that Myers caused Brittany Chappell's death while committing or attempting to commit the offense of kidnapping, a capital-murder felony. *See* Tex. Penal Code Ann. § 19.03(a)(2). During the charge conferences, Myers twice requested and the trial court twice denied a jury instruction on the lesser-included offense of murder based on Myers's contention that he had not participated in Chappell's kidnapping.

Leveraging the trial court's denial into his final argument, Myers urged the jury to acquit him of capital murder because the State had not proved the aggravating offense, kidnapping. In its rebuttal, the State argued the contrary: "That is kidnapping. If that's not kidnapping, I don't know what is."

2

With the battle lines drawn over whether Myers murdered Chappell while participating in her kidnapping, the jury sent out the following note: "Our qu[e]stions are around kidnapping. [1] What's the legal definition of kidnapping? We just want the simplest term of kidnapping. [2] What does restrain have to do w/ the charges? [3] Does ['] restrain['] have the same meaning as ['] abduct[']?" The trial court responded that the definitions were in the charge and instructed the jury to refer to the charge and to continue deliberating. And indeed, the charge did define those terms.[1] Less than an hour later, the jury found Myers guilty of capital murder.

---

[1] Page 1 provided, in pertinent part:

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

A person commits the offense of capital murder if the person intentionally commits the murder in the course of committing or attempting to commit kidnapping.

A person commits the offense of kidnapping if he intentionally or knowingly abducts another person.

. . . .

"Restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. Restraint is "without consent" if it is accomplished by force, intimidation, or deception.

"Abduct" means to restrain a person with intent to prevent her liberation by secreting or holding her in a place where she is not likely to be found; or using or threatening to use deadly force.

*See* Tex. Penal Code Ann. §§ 20.01(1)(A), (2)(A), (B), 20.03(a) (West 2011).

## II. Issue

In contending that the trial court erred by declining to instruct the jury on the lesser-included offense of murder, Myers essentially argues that there were instances during the kidnapping when he was absent and other times when, although present, he passively observed; thus, he suggests, the jury could have used those instances to acquit him of kidnapping. Pointing to the jury note, he argues that the jury itself questioned his role, if any, in the kidnapping. While we agree that Myers was not always present or actively participating in the kidnapping, we disagree that it makes any difference for lesser-included-offense, jury-charge purposes.

## III. Discussion

### A. Standard of review

We use a two-step analysis to determine whether an appellant was entitled to a lesser-included-offense instruction. *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993). First, the lesser offense must come within code of criminal procedure article 37.09's requirements. Tex. Code Crim. Proc. Ann. art. 37.09 (West 2006); *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). Next, some evidence must exist in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672–73.

The parties do not dispute—and we agree—that as alleged here, murder is a lesser-included offense of capital murder under article 37.09. *See* Tex. Code Crim. Proc. Ann. art. 37.09(1); *Zamora v. State*, 998 S.W.2d 290, 293 (Tex. App.—Fort Worth 1999, pet. ref'd).

So the dispositive issue is whether some record evidence exists from which a jury could rationally find that if Myers is guilty, he is guilty only of the lesser offense of murder. *See Hall*, 225 S.W.3d at 536; *Salinas*, 163 S.W.3d at 741; *Rousseau*, 855 S.W.2d at 672–73. We evaluate the evidence in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense. *Id.* We may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Hall*, 225 S.W.3d at 536. The evidence must show that the lesser-included offense is a valid, rational alternative to the charged offense. *Id.* It is not enough that such evidence "would support a conviction for the lesser[-]included offense, as if that were the only offense the jury was authorized to convict upon." *Moreno v. State*, 858 S.W.2d 453, 459 (Tex. Crim. App.), *cert. denied*, 510 U.S. 966 (1993). Rather, the record must also show a rational basis for the jury to reject convicting the defendant of the greater, capital offense. *Zamora*, 998 S.W.2d at 293.

**B. Myers's arguments**

Throughout Myers's brief, he points to times and events when he was either not present or was not an active participant. For example, Myers correctly notes that he did not participate in Chappell's initial abduction and concludes that by the time he appeared, others had already completed her kidnapping. But caselaw refutes Myers's argument: an abduction and restraint do not necessarily occur in a single act but form a continuous, ongoing event. *See Weaver v. State*, 657 S.W.2d 148, 150 (Tex. Crim. App. 1983). As we will show, Chappell remained restrained well beyond the initial abduction.

Myers also cherry-picks moments when although he was present, he was not actively participating. For example, he can point to times when he was not the person who put Chappell in a closet, to moments when he did not kick Chappell while others did, to an aggravated assault and robbery of another person (Justin Francis) at which Myers asserts he was a passive observer, and to testimony indicating that he played no part in the decision to kill Chappell. These arguments also fail because the charge authorized the jury to convict him as a party. *See* Tex. Penal Code Ann. § 7.02(a)(2) (West 2011).[2] Myers appears to argue that he simply was present and that

---

[2]The charge included a "party" instruction:

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or

presence alone is not enough to make him a party. *See Barrientos*, 539 S.W.3d at 489–90. But the evidence showed far more than mere presence; it showed that he actively participated, with the intent to promote and assist the kidnapping.

## C. The evidence

The evidence showed two other parties to the offense: Albert Martinez and his girlfriend Alexandria Flores.

Martinez was a face-tattooed convicted felon who was a member of the Tango Blast prison gang. He did not testify.

Flores did testify and acknowledged pleading guilty to murder in exchange for a 35-year sentence and her testimony against her co-defendants. She also acknowledged that Martinez pleaded guilty to capital murder and received a life-without-parole sentence.

### 1. Flores's testimony

Flores testified that in late September 2015, she and Martinez met Chappell at a Fort Worth "game room," which witnesses described as an illegal gambling establishment, and invited Chappell back to their apartment. Flores asserted that although neither she nor Martinez had ever met Chappell before, Chappell accepted their invitation and that not only did Chappell accept, but she even had the person she

---

attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

*See id.*; *Barrientos v. State*, 539 S.W.3d 482, 489–90 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

was with drive the three of them to Martinez and Flores's apartment, which other witnesses described as being in an unsafe neighborhood. One witness stated that the apartment was in Fort Worth's Stop Six area, another described it as being in "the projects," and the investigating detective labeled it simply as in an area of "very high" crime—an area in which he had previously investigated two murders and assisted other detectives on approximately four or five other cases. The detective agreed that it was not an area where people tended to cooperate with the police.[3]

Inside the apartment, the three went upstairs to Martinez and Flores's bedroom, where they smoked methamphetamine.[4] There was a second bedroom upstairs, but Flores's six-month-old daughter occupied it.[5]

---

[3]Flores was the only witness who testified about how she and Martinez managed to get Chappell into their apartment, and as noted, she testified that Chappell went there willingly. The unidentified driver did not testify. Other evidence suggested that Francis could supply Martinez with Rohypnol, "the date rape drug," but at trial Francis denied having sold any Rohypnol to Martinez before the offense occurred. (The medical examiner did not check for Rohypnol during Chappell's autopsy.) Regardless of whether Chappell went voluntarily to the apartment, we agree with Myers that the evidence shows that he arrived after Martinez and Flores had already secured Chappell in their bedroom.

[4]The toxicology confirmed that Chappell had methamphetamine in her system.

[5]Flores maintained that her daughter was in the apartment only after they had killed Chappell and while they were disposing of Chappell's body. Sometime after the murder, Flores absconded, and her understanding was that someone had later swapped the bedrooms so that her daughter now occupied the bedroom in which Chappell had been killed.

At some point, Chappell ostensibly disclosed that she knew a place with money, guns, and a safe. Because Flores and Martinez wanted to "rob [the] property," Martinez started questioning Chappell about the location. But when Chappell refused to tell, Martinez hit her repeatedly with a belt, and after Martinez rebuked Flores for not participating, Flores punched Chappell with her fists.

Myers, who lived next door, later came over to Martinez and Flores's apartment, and Martinez took him upstairs to the bedroom and showed him Chappell, who was then lying on the floor. After talking briefly to Martinez, Myers too started hitting Chappell—for perhaps 10 to 15 minutes—after which Martinez put Chappell into a closet.

Flores testified that they held Chappell for about two days during which time Chappell was repeatedly put into and taken out of the closet; Flores also said that Myers was in and out of the bedroom throughout that time. When asked whether Myers ever helped put Chappell back in the closet, Flores answered, "Yes. She was in and out so many times, you know." When asked how many times Myers helped, she answered that she did not know, just that it was "[n]ot every time." The first time Myers appeared with Chappell present—the time he beat her for 10 to 15 minutes— Flores said that it was fair to say that both Myers and Martinez put Chappell back in the closet.

Flores next described how the decision to kill Chappell came about, asserting that initially she and Martinez had talked about letting Chappell go. As Flores was

untying Chappell's hands, Chappell threatened to tell—presumably the authorities—if they released her. Martinez heard Chappell's comment, and after he expressed some confusion over it, Chappell repeated that if they let her go, she was going to tell on them. Apparently rethinking the matter, Martinez then decided that they would have to kill her.

Martinez and Flores initially tried to suffocate Chappell with a Walmart shopping bag, but their first attempt failed when Chappell bit through the bag. Because Chappell was struggling, Myers held her down by her legs and thighs while Flores, who by this time "just want[ed] it to be over," grabbed a shower curtain and gave it to Martinez, who then wrapped it around Chappell's head, face, and neck while Myers continued to hold her legs. Martinez squeezed Chappell's neck until she stopped struggling. When asked how long Chappell struggled, Flores responded, "Well, at the time it seemed like forever." Martinez and Myers then pushed Chappell's body back into the closet.[6]

After Myers had helped kill Chappell, he continued to act in lockstep with Martinez and Flores. Myers participated in disposing of Chappell's body, which (with the help of a fourth person) consisted of loading her body in an SUV, going to a

---

[6]Chappell's mother testified that Chappell was 30 years old at the time of her death, that Chappell and her two young children lived with her, and that she was helping support Chappell while Chappell was between jobs.

filling station to buy gas, transporting the body to a brushy area, dousing it with gas, and setting it on fire.[7]

Once back at Martinez and Flores's apartment, Martinez recorded a conversation on his cell phone during which Myers can be heard saying—at least according to Myers's ex-girlfriend who recognized his voice—"we killed that bitch." Flores recognized Martinez's, Myers's, and her voice on the recording and admitted at trial that they were discussing Chappell's murder. She maintained that Martinez had put a gun to her head during the entire conversation. Myers's father, whom the State also called to the stand, acknowledged recognizing Myers's voice but denied being able to make out what Myers had said. At the recording's end, Martinez can be heard saying, "I recorded 12 minutes of y'all." Martinez apparently intended to use the recording as an insurance policy against Flores and Myers.

### 2. Francis's testimony

Flores was not the only person who provided testimony placing Myers in Martinez and Flores' apartment during the kidnapping. Francis testified that after he delivered Rohypnol to Martinez and Flores's apartment, Martinez told him to wait; Martinez, Flores, and Myers then left the room. About 15 minutes later when the

---

[7]Pursuant to a plea bargain, this fourth person pleaded guilty to tampering with or fabricating physical evidence by altering, destroying, or concealing a human corpse. *See* Tex. Penal Code Ann. § 37.09(c) (West 2016). In exchange for his guilty plea, he received a seven-year sentence and had to testify truthfully, but he did not testify at Myers's trial.

three returned, Flores put a gun to Francis's head while Martinez accused him of delivering fake drugs; Martinez then went through Francis's pockets and took his money, phone, and a bag of methamphetamine that Francis had hidden in his sock. While all this was happening, Myers pulled up his shirt to display a gun in his waistband to Francis. When asked whether Myers was showing the gun as a sign that he was on Francis's side and would intervene if things went poorly, Francis responded, "No. . . . [That] [d]oesn't fit with what happened." Francis testified that by raising his waistband and displaying his gun, Myers was communicating that he was not afraid to use it.

Francis then related how Martinez walked him into a bedroom and how Martinez dragged a woman—"belly down and her arms . . . tied behind her back"—out of a closet and threw her on the bed. Francis described the woman as "[f]rantic" as she asked "why they were doing this to her." When Flores pointed out to Martinez that the woman had bled on the bed, Martinez erupted in anger and threw the woman on the floor where Martinez and Flores then kicked her. After the kicking stopped, Martinez dragged the woman back into the closet while Myers, who had been standing nearby but not participating in the kicking, held the door open and then closed it behind her. Martinez let Francis leave after he promised to return with real Rohypnol, but Francis did not return and testified that he never intended to. He said, "I was pretty scared for my life, and I really just wanted to leave any way I could."

Not only did Francis not return, but he did not call the police to tell them about the obviously kidnapped woman he had seen in Martinez and Flores's apartment. When confronted about not helping Chappell, he explained, "I was just scared."

Like Flores, Francis admitted testifying as part of a plea bargain: in exchange for his testimony, the State did not prosecute him for felony drug possession and agreed to probation along with credit for time served for two driving-while-intoxicated charges.

### D. Analysis

From start to finish, the evidence—regardless of its source—showed Myers acting in concert with Martinez and Flores. Martinez and Flores kidnapped Chappell and beat her in an unsuccessful attempt to compel her to identify a location they wanted to rob. Myers beat Chappell at least once. That he did not participate in every beating and at least once merely watched does not affirmatively show that he was not a party to the kidnapping.

And Myers also restrained Chappell. Evidence showed that on at least one occasion he held the door open while Martinez put Chappell into the closet and closed the door behind her. Ultimately, though, the issue is not really limited to whether Myers put Chappell into the closet. She was as much restrained in the bedroom as she was in the bedroom closet. Flores—speaking of her own attempts to leave after Martinez had hit her on many previous occasions—testified that leaving

13

the bedroom against Martinez's wishes, much less leaving the apartment, was not an option because Martinez's father guarded the downstairs area.[8] Thus at the very least, Myers participated in restraining Chappell in the bedroom.

To be entitled to a jury charge on the lesser-included offense of murder, Myers had to show that the jury could rationally reject the greater offense—capital murder—by finding that Myers committed only the murder but not the aggravating offense of kidnapping. *See Zamora*, 998 S.W.2d at 293. Although the jury was free to believe or disbelieve all or part of the evidence, it would be irrational in this case for the jury to simultaneously believe that Myers participated in the murder but not in the kidnapping, which preceded and ultimately led to the murder. *See id.* Myers's participation in the murder necessarily arose from his participation in the kidnapping.

We thus hold that the record does not reflect a rational basis for the jury to have rejected the aggravating offense of kidnapping and to have found Myers guilty only of murdering Chappell. *See id.* at 293–94. Thus, the trial court did not err by denying Myers's requested charge, and we overrule his sole issue.

## IV. Conclusion

Having overruled Myers's sole issue, we affirm the trial court's judgment.

---

[8]Martinez's father babysat Flores's daughter in her bedroom while Martinez and Flores carried Chappell's body downstairs.

/s/ Elizabeth Kerr
ELIZABETH KERR
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  December 13, 2018