

# NUMBER 13-22-00569-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**RAMIRO GARCIA LOPEZ JR.,**                                  **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                       **Appellee.**

---

## ON APPEAL FROM THE 430TH DISTRICT COURT
## OF HIDALGO COUNTY, TEXAS

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Peña
Memorandum Opinion by Justice Longoria**

Appellant Ramiro Garcia Lopez Jr. appeals his conviction for capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). By three issues, Ramiro argues: (1) the evidence was insufficient to support the conviction; and (2–3) the trial court erred in admitting hearsay testimony from an unavailable declarant. We affirm.

# I.    BACKGROUND[1]

Ramiro was indicted for capital murder on June 1, 2016. The indictment alleged that he:

> [O]n or about the 7th day of April A.D., 2016, . . . did then and there intentionally cause the death of an individual, namely, Gilberto Garces, by shooting him with a firearm, and [Ramiro] was then and there in the course of committing or attempting to commit the offense of kidnapping Gilberto Garces . . . .

Garces's wife, Elida Garza, testified that on April 6, 2016, she was supposed to meet with her husband at a grocery store in the afternoon. Garza explained that her husband mentioned he would first be going to a tire shop to "pick up some money." The tire shop, located in Mercedes, Texas, was owned by Ramiro and Pedro Lopez. Garza did not hear back from her husband, and he never met her at the grocery store. She testified that she called him more than fifteen times, but he did not answer. Garza explained that it was not unusual for Garces to stay out all night "drink[ing] with his friends, and sometime[s] stay over" with his friends. The next day, when she still had not heard from Garces, Garza reported him missing. Garza explained that the vehicle Garces was driving, which was registered to Garza, was equipped with OnStar, so they called to see if the vehicle could be located. Using OnStar's services, the Progreso Police Department determined that the vehicle was at Levis River in Mercedes. When Garza went to the location of the vehicle, there was a large police presence. She was informed that her

---

[1] Prior to the start of trial, Ramiro filed a motion to suppress evidence obtained via a search warrant, which was granted by the trial court. The order was appealed by the State, and this Court reversed and remanded the case for further proceedings. See State v. Lopez, No. 13-17-00181-CR, 2018 WL 4927271, at *8 (Tex. App.—Corpus Christi–Edinburg Oct. 11, 2018, pet. ref'd) (mem. op. on reh'g, not designated for publication).

vehicle was located there along with the body of her husband. Garza testified that Garces had "problems" with Pedro, Ramiro's brother, and that she knew Ramiro as a "friend of" Garces.

The State presented evidence of phone records that established that Garces's last active call was at 3:13 p.m., and the last time that the cellphone pinged was in the area of Ramiro's tire shop at 3:27 p.m. Oscar Bauza Perez, a former employee of Ramiro's tire shop, testified through a Spanish interpreter that Garces sometimes came to the shop to see "the boss," whom Perez identified as Ramiro. Perez recalled that he worked on April 6, and that Garces came by the shop that day in a gray SUV. Perez testified that a green truck, belonging to "El Gordo,"[2] was also there that day. Another former employee, Hugo Martinez, testified that Garces was at the tire shop on April 6, and he and Ramiro were talking. Ramiro and Garces, with others, went into the office and Ramiro asked Martinez to go to the store to get beverages for everyone.

Marcelo Garcia, a former major crimes investigator with the Hidalgo County Sheriff's Office (HCSO), testified that in executing a search warrant at Ramiro's tire shop, he located a nine-millimeter firearm in the office as well as a thirty-round magazine for a .223 caliber firearm. The officers also located a surveillance video with a live feed in the office. The evidence was collected by the crime scene investigators. HCSO Sergeant Juan Jose Vasquez testified that he was tasked with locating surveillance footage from

---

[2] El Gordo was identified in the record as Adalberto Moquesda Guardado. In 2020, we affirmed Guardado's conviction for the same capital murder as charged in this matter. *See Guajardo v. State*, No. 13-17-00509-CR, 2020 WL 103869 (Tex. App.—Corpus Christi–Edinburg Jan. 9, 2020, no pet.) (mem. op., not designated for publication). We note that the record in this cause number uses the spelling "Guardado," and to maintain consistency, we use the same spelling throughout this memorandum opinion.

the two points of interest for the investigation: the tire shop and the park where Garces's body was located. Within a mile of the tire shop, Investigator Garcia located a home equipped with a surveillance camera and was given access to the footage from April 6, 2016. During the relevant timeframe, the footage shows two gray SUVs and a green truck traveling together from the direction of the tire shop toward the park where Garces was found deceased the next day. Approximately sixteen minutes later, the green truck is seen traveling in the opposite direction, toward the tire shop. Sergeant Vasquez testified that it takes approximately fourteen to sixteen minutes to drive roundtrip between the tire shop and the location where Garces's body was found.

Oscar Gonzalez, a former crime scene specialist and evidence technician with HCSO, testified that during the execution of a search warrant at the tire shop, latex gloves, a baseball hat, and socks were recovered from a trash can. A live round of ammunition was also discovered on the ground in the back of the building. There was a white Ford F-150 parked at the tire shop which was also subject to the search. An empty "magazine clip" was recovered in the "door pocket" of the truck and a "pipe jack," a lever or arm used with a floor jack to lift a car, was also located in the backseat. Gonzalez also retrieved a Skil brand drill case which contained a drill and an extra battery, but was missing the charging cable. Inside the office of the shop, there was a television that depicted live surveillance footage. There were video cameras on the property that appeared in working condition.

Sandra Rangel, a former crime scene investigator with HCSO, testified that she documented and collected evidence from the scene where Garces's body was located.

4

Rangel documented a black wire with an electrical adapter wrapped around the right wrist of Garces. Rangel was unsuccessful in locating casings at the scene, which indicated to her that the casings were collected by the shooter, or a revolver was used, which does not dispense casings. Rangel explained that a few days after her initial processing of the crime scene, she was asked to return to search for casings or projectiles. Using a metal detector, she was able to find two projectiles, two copper jackets, and an empty nine-millimeter ammunition box. Rangel was present for the autopsy and took custody of the evidence obtained from the autopsy—including Garces's clothing, fingernail clippings, hair samples, and the charging cable. The evidence was submitted to the lab for testing. Rangel also assisted with the search of Garces's vehicle, but nothing was recovered for evidentiary purposes.

HCSO Sergeant Miguel Lopez, a former major crimes investigator, assisted in the investigation into Garces's murder. As part of the investigation, Sergeant Lopez recovered a green Chevrolet Silverado believed to be used in connection with the murder, which appeared to have had the back window replaced, was missing a portion of the backseat, and had a shop-vac in the backseat. The truck was seized and brought to the HCSO. Rangel testified that she conducted a search of the green truck and noted that it had been very recently thoroughly cleaned. The back seat had been partially removed and there was a shop-vac that contained glass shards inside.

Dr. Norma Jean Farley, the former chief medical examiner in Willacy County, testified that she performed the autopsy of Garces. Garces sustained four gunshot wounds to the face, one gunshot wound to his body, and one through his hand. There

were also bruises and contusions indicating blunt force trauma to the face, including a contusion on his head indicating being struck by "an instrument" creating a "v-shape." There were also numerous markings on Garces's back that indicated he had been struck with a "cylindrical object" like a crowbar or a pipe. Garces's right wrist and forearm area was restrained with the charging cable, leaving bruising underneath. The contusions from the cable were visible on both arms. She also removed projectiles from the body. Farley opined that the cause of death was the gunshot wounds to the head and chest.

HCSO Major Crimes Unit Investigator Javier Vargas confirmed that the charging cord belonged to a "[S]kil[] warrior drill"—the same model that had been located at the tire shop. Investigator Vargas also testified regarding surveillance footage that was collected from the tire shop. In the footage, Garces is seen at the tire shop with Ramiro, Adalberto Guardado, known as El Gordo, and others. The footage shows Garces enter Ramiro's office and then the footage, from all angles, cuts out for approximately two hours. Guardado is seen removing the pipe from the jack by the entrance of the shop as he enters. The surveillance footage also shows a glass repair company coming out to replace a window in the green Silverado.

Ramiro gave several statements to the investigators, including two statements to Investigator Vargas. Investigator Vargas explained that Ramiro's statements had discrepancies in them when compared to the security footage. Ramiro told the officers that he had not seen Garces in several weeks but, after the footage was reviewed, he explained that he had "forgotten" that he saw Garces the day he went missing. Ramiro stated that Garces had shown up unexpectedly and that he had not heard from or spoken

6

to Garces for three weeks leading up to that day. However, Investigator Vargas confirmed that the phone records indicated there was communication between Ramiro and Garces prior to Garces arriving that day. After he was arrested, Ramiro spoke with Investigator Vargas again. This time, Ramiro admitted to knowing what had happened to Garces, but he placed the blame on "El Gordo" and two of his friends from Mexico. According to the statement, Ramiro was told that Garces had stolen drugs from the men from Mexico. When Garces arrived unexpectedly at the tire shop, he asked Ramiro for money. Ramiro explained that he led Garces to his office to give him some cash. According to the statement read to the jury:

> [Garces] had not seen the two men there and he stood up when he saw them. The two men were to one side of the entry. Then, the two men told [Garces] "where were you [Garces]? We were looking for you? [sic]." Then El Gordo punched [Garces], knocking him to the floor. El Gordo and the two other men started beating [Garces]. I didn't touch [Garces] because I don't have the courage to do that. El Gordo and one of the men put [Garces] into El Gordo's green truck that was parked inside the shop. El Gordo and that man took [Garces] in the truck and the second man from Mexico took [Garces's] SUV. El Gordo came back with the two men from Mexico about 45 minutes to an hour later in the green truck. They didn't talk about what they had done and I didn't know that they had killed [Garces] until the next day when my daughter told me that it had came out on Facebook. That same day, El Gordo told me that he and the two other men had beat up [Garces] and that they had killed him over the drugs that he had supposedly stolen. I got angry with El Gordo, because he had told me before the incident that they were just going to rough him up, meaning to say they were just going to give me [sic] a beating. I didn't see El Gordo again until Monday when he helped me to mow the grass. Later we left the house and the police stopped us. Gordo left me at my mother-in-law's house and he went home. I haven't seen or talked to El Gordo since then. I want to say that Hugo, Oscar and I are innocent.

Based on this third statement, Investigator Vargas believed that the attack on Garces had been planned. Investigator Vargas stated:

7

The surveillance video, the statements that were given to us. The video, surveillance video at [from the neighboring home]. The evidence recovered in his vehicle. The drill recovered in the search warrant at the tire shop, the cap in the trash, all those things are things that led me to believe that [Ramiro] was guilty.

During the course of the investigation, Investigator Vargas learned that Ramiro was indebted to Garces, and opined that the debt served as Ramiro's motive to kidnap and kill Garces. Guardado was arrested after Ramiro. Guardado admitted to his involvement in the murder of Garces, indicating that Garces was beaten in the office of the tire shop first. Guardado stated that the pipe from the jack was used in the beating. Guardado further stated that Garces was put into the green truck and while they were driving to the canal, Garces regained consciousness and there was a struggle, leading one of the Mexican men, Sergio Cavazos, to shoot Garces. The shot shattered the back window, which, according to Guajardo, Ramiro had replaced. Guadardo did not indicate that Ramiro went to the canal, nor did he state that Ramiro ordered him to kill Garces.

Investigator Vargas explained that the video footage from the tire shop that day shows Guajardo grabbing the pipe and bringing it into the office approximately one hour and twenty minutes prior to Garces's arrival at the shop. According to Investigator Vargas, this indicated that the attack on Garces was planned. Investigator Vargas also opined that the tactic of moving the other men's vehicles out of sight before Garces's arrival indicated a planned attack.

Richard Hitchcox, a former firearm examiner with the Texas Department of Public Safety, discussed the different characteristics, including lands and grooves, that firearms leave on a fired projectile. Hitchcox explained that these characteristics potentially allow

8

an examiner to determine what type of gun shot a particular bullet. Hitchcox testified that none of the bullet fragments tested came from the handgun located in Ramiro's office.

Vanessa Nelson, a former DNA technical leader for the Texas Department of Public Safety's (DPS) crime laboratory, testified that she supervised the technician who performed the DNA analysis of the evidence in the case. As to any of the blood or DNA, Ramiro was excluded as a possible contributor. Alejandro Vazquez, a forensic scientist with the DPS crime lab, testified that a supplemental report was created "to further expand on the inconclusive range." He explained that Ramiro was likely excluded as a possible contributor to the DNA swab taken from the right underarm of Garces's shirt.

Jesus Lopez, Ramiro's former son-in-law and a relative of Garces, testified that in 2017 he gave a statement to police stating that, while intoxicated, Ramiro told him that he hired two individuals from Mexico to kill Garces because of owed money. Jesus was told that Garces was shot in the tire shop and in a green truck. When Garces was shot in the green truck, it shattered glass. Jesus was told that a revolver was used. Jesus also stated that Ramiro told him Garces was struck with a pipe from a jack over the head. Garces's body was dumped. On cross-examination, Jesus explained that in 2021, after being incarcerated with Ramiro, he made an additional statement to police explaining that he was "not in the right state of mind" and was "emotionally unstable" when he gave his initial statement in 2017. He clarified in his trial testimony that his 2017 statement was not a lie.

Garces's son, Gilberto Garces III (Garces III) testified that he often went with his father to Ramiro's tire shop to "pick up money and roaches." According to Garces III,

9

Ramiro owed Garces approximately $45,000, and Garces was upset about that.

The jury returned a verdict of guilty of capital murder as charged in the indictment. Pursuant to law, the trial court sentenced Ramiro to life in prison, without the possibility of parole. Ramiro filed a motion to dismiss, which was denied. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

In Ramiro's first issue, he challenges the sufficiency of the evidence to support his conviction, arguing there was insufficient evidence to prove that he "intended to murder [Garces] in the act of committing a kidnapping, either as the primary actor or as a party."

### A.    Standard of Review & Applicable Law

We review the sufficiency of the evidence by considering "all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). The jury is the sole judge of witnesses' credibility and weight to be given the evidence presented, and we defer to those conclusions. *Hammack*, 622 S.W.3d at 914 (citing *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012)). We look to the "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Id.* at 914–15. Not every fact or piece

10

of evidence needs to point directly to appellant's guilt, so long as the cumulative force of all the evidence supports the convictions. *Id.* at 914. "Juries are permitted to draw reasonable inferences from the evidence presented at trial 'as long as each inference is supported by the evidence presented at trial.'" *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 15).

We measure the sufficiency by the elements of an offense as defined by a hypothetically correct jury charge. *Hammack*, 622 S.W.3d at 914. "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(a). As relevant here, a person commits capital murder if the person intentionally commits the murder in the course of committing or attempting to commit kidnapping. *Id.* § 19.03(a)(2). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." *Id.* § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though

11

having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. *Id.* § 7.02(b). "However, mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012).

**B.    Analysis**

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *Barrientos v. State*, 539 S.W.3d 482, 489 (Tex. App.—Houston [1st Dist.], 2017, no pet.).

The jury heard testimony from Garces's son, Garces III, stating that Ramiro was indebted to Garces in the amount of $45,000. Based upon his investigation and the evidence collected, such as the surveillance footage from the tire shop showing Guardado bringing a pipe to Ramiro's office and the vehicles of the other men involved in the crime being moved out of sight prior to Garces's arrival at the shop, Investigator Vargas stated that the attack on Garces was coordinated and planned. After giving multiple statements, in which he contradicted himself, Ramiro admitted that Garces came to the tire shop the day he was killed, that he went into Ramiro's office following Ramiro, and that Ramiro witnessed Garces being beaten by three men in his office. While Ramiro denied being

12

part of the conspiracy to kidnap and murder Garces, he did admit that he was aware that there was a plan to "rough up" Garces.

Ramiro argues that there is no evidence that he assisted or promoted the kidnapping or murder of Garces. Specifically, he points to evidence that shows he did not accompany the other men to the canal where Garces was ultimately found deceased. While he acknowledges that he knew there was an intent to "rough up" Garces, he argues that that knowledge alone is not sufficient for a conviction for capital murder. *See Meyers v. State*, 626 S.W.2d 778, 779 (Tex. Crim. App. 1982) ("[T]he mere presence of the accused in the company of the accomplice shortly before or after the commission of the offense is not, in itself, sufficient corroboration."). However, contrary to Ramiro's assertion, the jury heard evidence that Ramiro hired men to commit Garces's murder and that he was indebted to Garces and there was animosity regarding the debt. Further, the jury saw video surveillance that showed Ramiro leading Garces into his office on the day that Garces was murdered, and the jury also heard testimony that Garces was beaten unconscious with a pipe jack from Ramiro's shop in Ramiro's office, then tied up with a charging cord from a drill located at Ramiro's shop, and taken away in the green truck to be shot and killed. Even if Ramiro did not know that Garces would be murdered, a reasonable jury could have concluded that Garces should have anticipated the murder was possible and they had beaten Garces unconscious before taking him away in the green truck. The jury as fact-finder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App.

13

2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). Here, in addition to the assertions made by Ramiro, the jury heard evidence connecting Ramiro to the murder of Garces and the jury was free to believe the testimony of the witnesses who stated that Ramiro was involved in the murder and disbelieve any testimony to the contrary. *See Rodriquez v. State*, 508 S.W.2d 80, 82–83 (Tex. Crim. App. 1974) ("Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with suspicious circumstances such as unreasonableness of the hour, lack of apparent reason for such presence, being in the company of accomplice and subsequent flight, furnishes sufficient corroboration to support a conviction."). Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that the evidence is sufficient to support Ramiro's conviction. *See Nelson v. State*, 405 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). We overrule Ramiro's first issue.

### III.   ADMISSION OF EVIDENCE

In his second and third issues, Ramiro contends that the trial court abused its discretion in admitting the transcript of Investigator Alfredo Avila's testimony from a prior hearing. Ramiro argues that the transcript was inadmissible under Texas Rule of Evidence 804 and in violation of Ramiro's Sixth Amendment right to confrontation. *See* TEX. R. EVID. 804; U.S. CONST. amend. VI.

### A.   Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). We will not

14

reverse unless the record shows a clear abuse of discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court abuses its discretion only when the court's decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Id.*

## B.    Analysis

The Texas Rules of Evidence provide that former testimony of an unavailable witness is admissible in a criminal case if (1) the testimony was given by the witness at another hearing of the same or a different proceeding and (2) the party against whom the testimony is offered had opportunity and similar motive as in the pending matter to develop the testimony in the prior proceeding. TEX. R. EVID. 804(b)(1). The parties do not dispute that Investigator Avila was unavailable due to a serious illness, as Investigator Vargas testified that Investigator Avila had been diagnosed with Lou Gherig's disease, preventing him from attending trial. *See id.* R. 804(a)(5). Ramiro argues that Investigator Avila's previous testimony was given at a prior suppression hearing which was "unrelated to [Ramiro's] pending capital murder charge." The final requirement for admission under 804(b)(1) is that the "party against whom the testimony is . . . offered [must have] had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." *Id.* R. 804(b)(1). The purpose of this provision of the rule is to protect the party against whom the hearsay evidence is offered from the ill-effects of not being able to examine the witness who made the statement or gave the testimony. *Jones v. State*, 843 S.W.2d 487, 491 (Tex. Crim. App. 1992), *abrogated on other grounds by Maxwell v. State*, 48 S.W.3d 196 (Tex. Crim. App. 2001). If the party against whom the hearsay

evidence is offered previously had an opportunity and similar motive to examine the witness, then the ill-effects are ameliorated. *Id.*

A defendant's Sixth Amendment right to confront and cross-examine adverse witnesses is an essential element of a fair trial. *See Pointer v. Texas*, 380 U.S. 400, 405 (1965). The Sixth Amendment's Confrontation Clause does not prohibit admission of testimony from a prior judicial proceeding in place of live testimony at trial. *See Ohio v. Roberts*, 448 U.S. 56, 65 (1980). The Clause does, however, operate in two different ways to restrict the range of admissible hearsay. *Roberts*, 448 U.S. at 65. First, the prosecution usually must demonstrate the unavailability of the declarant whose testimony is sought to be used against the defendant. *Id.* Second, the testimony is admissible only if it bears adequate "indicia of reliability." *Roberts*, 448 U.S. at 66. In regard to the first of the two requirements, an absent witness is not "unavailable" for purposes of the exception to the Confrontation Clause unless prosecutorial authorities have made a good-faith effort to obtain the witness' presence at trial. *Barber v. Page*, 390 U.S. 719, 724–25 (1968); *Otero–Miranda v. State*, 746 S.W.2d 352, 354 (Tex. App.—Amarillo 1988, pet. ref'd, untimely filed). As to the second requirement, former trial testimony bears sufficient indicia of reliability if defense counsel had adequate opportunity to cross-examine the witness at the prior trial. *See Mancusi v. Stubbs*, 408 U.S. 204, 216 (1972); s*ee also Roberts*, 448 U.S. at 73–74 (preliminary hearing testimony).

Even if we were to conclude that the trial court erred in admitting the testimony, we have a fair assurance that any such error did not affect Ramiro's substantial rights. *See Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Ramiro complains that

16

if not for allowing Investigator Avila's prior testimony, his third statement to police would not have been admitted. We disagree with this assertion. The third statement, wherein Ramiro admits to knowing there was an intent to "rough [Garces] up," was made directly to Investigator Vargas, according to Investigator Vargas's testimony. Ramiro did not object to the admission of the third statement made to Investigator Vargas. The facts that came from the statements given to the investigators were also proved by other evidence admitted at trial, such as the testimony of Garces III and Jesus, along with the statement of Guardado. As such, Ramiro has not shown that his substantial rights were affected and error, if any, in admitting Investigator Avila's prior testimony does not warrant reversal. *See Valle v. State*, 109 S.W.3d 500, 509–10 (Tex. Crim. App. 2003) (explaining that error in admission of evidence is cured where same evidence is admitted elsewhere without objection). We overrule Ramiro's second and third issues.

## IV.  CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA<br>
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
23rd day of May, 2024.

17